Robert E. Willis, as Receiver of Broadway-Clark Currency Exchange, Inc., Plaintiff-Appellee, v. Fidelity and Deposit Company of Maryland, Defendant-Appellant, Exchange National Bank of Chicago, Defendant.

Fidelity and Deposit Company of Maryland, Cross-Plaintiff-Appellant, v. Robert E. Willis, as Receiver of Broadway-Clark Currency Exchange, Cross-Defendant-Appellee.

Gen. No. 45,391.

Opinion filed January 21, 1952. Rehearing denied February 4, 1952. Released for publication February 5, 1952.

DENT, HAMPTON & DOTEN, of Chicago, for appellant.

HIRSCH E. SOBLE, and THOMAS H. FITZGERALD, both of Chicago, for appellee.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

Broadway-Clark Currency Exchange, Inc., was licensed by the Auditor of Public Accounts on February 6, 1945, to operate a community currency exchange at 2805 North Clark Street, Chicago. The exchange was operated until September 2, 1949, when it was closed by the Auditor. On September 12, 1949 the Auditor determined that the exchange was insolvent and that its business should be liquidated, appointed Robert E. Willis, as Receiver, and directed the Attorney General to file a complaint in the circuit court of Cook county for its liquidation and dissolution and for an injunction restraining it from continuing operations. The Attorney General filed the complaint. On March 4, 1950, the Receiver filed a complaint in the circuit court of Cook county against Fidelity and Deposit Company of Maryland, alleging that it issued to the currency exchange its blanket bond, insuring the exchange against loss by burglary, larceny or embezzlement up to $10,000 and that the exchange sustained losses totaling $5,455.48 by larceny or embezzlement for which the surety is liable, together with reasonable

374

attorneys' fees, interest and costs. Defendant's answer required plaintiff to prove that the exchange sustained the losses alleged and that such losses were of the type covered by the bond. Defendant, by an amended counterclaim, sought to set off its claim for $6,236.86 against the exchange, predicated upon three grounds for recovery. On motion of plaintiff the court struck the amended counterclaim. Defendant elected to stand on its amended counterclaim and it was dismissed. Defendant appealing, asks that the order striking and dismissing its amended counterclaim be reversed and that the cause be remanded for further proceedings.

Count 1 of the amended counterclaim alleges that on December 5, 1947, the exchange executed and delivered to the surety a written application, requesting it to act as surety on the $7,000 annual license bond required of the exchange for the year 1948 by section 5 of an Act in relation to the regulation of community currency exchanges (par. 35, ch. 16½, Ill. Rev. Stat. 1951 [Jones Ill. Stats. Ann. 10.74]), which application contained agreements on the part of the exchange to indemnify the surety against "all loss, liability, costs, damages, attorney fees and expenses whatsoever, which the Company (surety) may sustain or incur by reason of executing said bond, in making any investigation thereof, in prosecuting or defending any action which may be brought in connection therewith, in obtaining a release therefrom, and in enforcing any of the agreements therein contained, . . . that nothing herein contained shall be construed to waive or abridge any right or remedy which the Company might have if this instrument were not executed . . . , that the above agreements shall bind the undersigned and the heirs, executors, administrators, successors and assigns of the undersigned." The amended counterclaim further alleges that on December 5, 1947, the surety, in consideration of such promises and agreements, executed

375

and delivered, as surety for the currency exchange, and the latter, as principal, executed and delivered to the Auditor of Public Accounts as obligee, a $7,000 currency exchange bond dated January 1, 1948, conditioned, among other things, upon the payment by the exchange of all liability incurred upon any money orders issued by it, of all liability for any sum due to the payee of any check, draft or money order left with it for collection, and of all liability incurred by it in connection with the acceptance of funds for the payment of local utility bills.

The counterclaim further averred that on November 29, 1948, the exchange executed and delivered to the surety another written application requesting the surety to act on its annual license bond for the year 1949, which application contained identical agreements on the part of the exchange as were contained in the application for 1948; that on December 1, 1948, the surety, in consideration of such promises, executed as surety, and the currency exchange executed as principal and delivered to the State Auditor as obligee, a new $7,000 currency exchange license bond, effective for the year 1949, containing the same conditions as the 1948 license bond. Copies of the exchange's applications for the annual license bonds are attached as exhibits. The counterclaim further stated that on or prior to September 1, 1949, the exchange became and was at all times thereafter insolvent; that it breached and failed to keep and perform the conditions of its annual license bonds for each of the years 1948 and 1949 in that the exchange failed and was unable to pay divers money orders purchased from and issued by it and the amount of its liability on divers checks, drafts and money orders left with it for collection aggregating $5,399.14, listed on an exhibit; that the exchange failed and was unable to pay its liability totaling $87.72, as shown on another exhibit, in connection with its acceptance of

376

funds for the payment of public utility bills; that on December 29, 1949, an order was entered in the receivership proceeding, allowing as claims against the exchange "and the receivership thereof" all of the claims listed on the exhibits attached to the counterclaim; that the surety became and was liable, on and prior to September 1, 1949, under the two currency exchange license bonds it executed as surety for the exchange to the Auditor for the sum of $5,399.14 and $87.72, respectively, and the exchange under and by virtue of the agreements in the applications became and was obligated to indemnify the surety on and prior to September 1, 1949, against all loss, liability, costs, damages, attorneys' fees and expenses whatsoever which the surety sustained or incurred by reason of executing and delivering the currency exchange license bonds; that on January 17, 1950, the surety employed a law firm to investigate, determine and pay its liability, if any, under the currency exchange license bonds; that the reasonable value of the services so performed exceeds the sum of $750, which the surety has incurred and will be obligated to pay; and that on January 23, 1950, the surety paid $5,399.14 and on March 3, 1950, paid the further sum of $87.72 to the Auditor for the use and benefit of the creditors of the exchange whose claims were allowed in the receivership proceeding and are listed on the exhibits attached to the counterclaim, in payment of the surety's liability under both currency exchange license bonds. Count 2 relies on the allegations of Count 1 and states further that by reason of the payments by the surety and by reason of the suretyship relation between the exchange and the surety the exchange became and was obligated to indemnify the surety on and prior to September 1, 1949, against all loss, liability, costs, damages, attorneys' fees and expenses whatsoever, which the surety sustained or incurred by reason of having signed and

delivered the currency exchange license bonds; that the surety, upon making payments to the State Auditor, became subrogated to and is now the actual bona fide subrogee of the allowed claims against the exchange and its Receiver, listed on the exhibits attached to the counterclaim; that on both counts counterclaimant prays judgment against the Receiver for $6,236.96, together with interest and costs of suit; that there be set off the respective claims of the Receiver alleged in his complaint and that of the surety alleged in the amended counterclaim; and that the surety have judgment in its favor and costs of suit.

The Community Currency Exchange Act was approved June 30, 1943, and amended in 1947, 1949 and 1951. Section 5 states that before any license shall be issued to a community currency exchange the applicant shall file annually with and have approved by the Auditor a surety bond in the sum of $3,000, or a larger sum, depending on the average amount of liability during the previous year, such bond to run to the State of Illinois, for the benefit of any creditors of the exchange for any liability incurred on any money orders issued by the exchange and any liability for any sums due to any payee of any check, draft or money order left with the exchange for collection, and for any penalties that may be imposed or for any liability incurred by the exchange in connection with its acceptance for payment of local utility bills. Section 6 requires every applicant, after his application for a license has been approved, to submit a policy or policies of insurance to be approved by the Auditor, insuring the applicant against loss by burglary, larceny, forgery or embezzlement in a sum not exceeding certain amounts determined by the average amount of cash and liquid funds kept on hand at the office of the exchange. Section 7 requires the exchange to have at all times a minimum sum of $2,000 of its own funds available for the use

and purpose of its business, exclusive of and in addition to funds received in exchange or transfer; and in addition shall at all times have on hand an amount of liquid funds sufficient to pay on demand all outstanding money orders issued by it. Section 15.1 contains provisions for the closing and liquidation of an exchange and the payment of ratable dividends, and states that all expenses of the receivership, including reasonable receiver's, solicitor's and attorney's fees approved by the Auditor, shall be paid out of the assets of the exchange. This section was amended in 1951 to provide that in the event a suit is instituted or maintained by the receiver on any bond or policy of insurance issued pursuant to the requirements of the Act, the bonding or insurance company shall not have the right to interpose or maintain any counterclaim based upon subrogation or upon any express or implied agreement or right to indemnity or exoneration, or upon any other express or implied agreement with, or right against, the currency exchange, with a proviso that nothing therein shall prevent such bonding or insurance company from filing such claim in the liquidation proceeding. We do not believe that the amendment of 1951 should affect our views as to the merits of the instant case.

The surety asserts that the allowance as a setoff of a claim acquired against an insolvent prior to the insolvency proceeding is generally recognized in all jurisdictions; that the receiver takes the estate of the insolvent as he finds it and succeeds only to such rights and is burdened with such obligations as the insolvent had at the time of his appointment; that the allowance of such a setoff does not affect an unlawful preference; that the claims alleged in the complaint and in the amended counterclaim both arose prior to the closing of the currency exchange and plaintiff's appointment as its receiver; that its claim alleged in Count 1, based

upon breaches by the exchange of its written indemnities, arose prior to September 1, 1949; that its claim alleged in Count 2, insofar as it is predicated upon its implied right of indemnification and reimbursement, arose prior to September 1, 1949; and that its claim alleged in Count 2 insofar as it is founded upon its implied right of subrogation, also forms the subject matter for an allowable setoff; and that the Illinois Community Currency Exchange statute does not prohibit one surety from signing both the blanket bond and the license bond for the same currency exchange, citing *Hynes v. Illinois Trust & Savings Bank,* 226 Ill. 95; *O'Connell v. Nelson,* 281 Ill. App. 327; *Streeter v. Junker,* 230 Ill. App. 366; *Evans v. Illinois Surety Co.,* 220 Ill. App. 199; *Scott v. Armstrong,* 146 U. S. 499, 510; *Fidelity and Deposit Co. of Maryland v. Duke,* 293 Fed. 661, 665; *Merwin v. Austin,* 58 Conn. 22, 18 Atl. 1029; *Chenault v. Bush,* 84 Ky. 528, 2 S. W. 160; *Cosgrove v. McKassy,* 65 Minn. 426, 68 N. W. 76; *Barnes v. Barnes,* 106 Va. 319, 56 S. E. 172; *In re Estate of Dailey,* 19 F. (2d) 95; *State-Planters' Bank & Trust Co. of Virginia v. First National Bank,* 76 F. (2d) 527, 532; *Prudential Ins. Co. of America v. Goldsmith* (Mo. App.), 181 S. W. (2d) 201, 204; 31 C. J. sec. 33, p. 438; 42 C. J. S. sec. 14b, p. 588; *Gage v. Lewis,* 68 Ill. 604; *National Slovak Society v. Matlocha,* 307 Ill. App. 41; *Mellette Farmers' Elevator Co. v. H. Poehler Co.,* 18 F. (2d) 430; and *Quinlan & Tyson, Inc. v. National Casualty Co.,* 311 Ill. App. 369. Plaintiff agrees that where the receiver of a bank sues a depositor for money owed to the bank, the depositor may counterclaim for the amount of his deposit up to the amount of the receiver's claim, as held in *Scott v. Armstrong, supra.* Plaintiff maintains that the rule discussed in the *Scott* case is inapplicable to the facts of the instant case, and that both the United States Supreme Court and the

Illinois Supreme Court have so held. The Receiver also places emphasis on the fact that in the instant case we have an insurance policy and bond executed pursuant to the mandate of the statute, which has established a new relation and a new set of equities, not subject to destruction at the pleasure of the exchange or defendant.

We agree with the surety that the claims alleged in the complaint and in the counterclaim both arose prior to the closing of the currency exchange and plaintiff's appointment as its receiver. Count 1 of the amended counterclaim alleges breaches by the exchange of its written indemnity agreements to exonerate and indemnify the surety against liability incurred as well as loss sustained by reason of it acting as surety on such annual license bonds. The surety's claim, alleged in Count 2 and predicated upon its implied right of indemnification, and its further claim in that count based upon its implied right of subrogation, began with the contract of suretyship and not with the payment of the debt by the insured. The courts of most jurisdictions recognize and allow a debtor of an insolvent to set off a claim against the insolvent acquired prior to the insolvency proceeding upon the theory that where the right of setoff exists at such time, the insolvent's debtor equitably owes only the balance, if any, over and above the amount which the insolvent owes him, and that such balance is the only debt that passes to the receiver on his appointment. In 40 A. L. R., page 1096, appears a note entitled, "Setoff by surety of claim paid for insolvent principal whose assets are being administered for the benefit of creditors, against own indebtedness to principal." On page 1097 the author says:

"There is a difference of judicial opinion as to whether a claim against an insolvent estate arising

out of the discharge by the surety of his principal's obligation after the latter's assets have passed into the hands of one who is administering them for the benefit of his creditors is based upon an equity existing at the time the property passed to the creditors' representative, and so entitled to be set off as against the surety's debt to the insolvent, or is an after-acquired claim within the rule that claims acquired subsequent to an assignment for creditors, the institution of proceedings against an insolvent, or the decease of the insolvent, may not be set off.''

The author sets out cases where the right to setoff has been generally or qualifiedly affirmed. Supporting that rule are *Fidelity and Deposit Co. v. Duke, supra,* decided in 1923 and cited by the surety, and several decisions from other states. Supporting the rule where the right to setoff was denied the author cites *United States Fidelity & Guaranty Co. v. Wooldridge,* 268 U. S. 234; *Mack v. Woodruff,* 87 Ill. 570; and a number of cases from other jurisdictions.

We agree with plaintiff's contention that the *United States Fidelity & Guaranty Co. v. Wooldridge* case supports his position. In that case the National Bank of Cleburne, Texas, became insolvent through the frauds of its president and closed its doors on October 17, 1921. The receiver began suit on a bond executed by the bonding company on August 28, 1921, indemnifying the bank against such losses to the extent of $25,000. Defendant pleaded in setoff that on August 24, 1921, it became surety for the bank upon another bond to a railroad company, conditioned upon payment by the bank to the railroad company of the latter's deposits, and that on January 16, 1922, it paid that company $23,312.51, became subrogated and received an assignment. The trial court denied defendant's right of setoff. The judgment was affirmed by the

circuit court of appeals and the case went to the United States Supreme Court, where the judgment was affirmed. Speaking for that court, MR. JUSTICE HOLMES said (237):

"The two bonds were wholly independent transactions and were not brought into mutual account by an agreement of the parties. The Guaranty Company after the insolvency of the Bank could not have bought a claim against the Bank and used it in setoff. *Scott v. Armstrong,* 146 U. S. 499, 511. . . . The Receiver contends that that is the position of the defendant here, because it was only a guarantor and was only liable upon the default of the President of the Bank that produced the insolvency. The Court below treated the claim of the Railway Company against the Bank as acquired by the defendant after the insolvency. The defendant, however, contends that upon its payment to the Railway Company its subrogation related back to the date of its contract; and we will assume for purposes of argument that this is true. But suppose it is, the right of the Railway Company was simply that of a depositor, a right to share with other unsecured creditors in the assets of the Bank, of which the bond now in suit was a part. There would be no equity in allowing the Railway Company a special claim against this bond. We will assume that if the Railway Company had insured the honesty of the Bank's officers the Bank might have offset the obligation of the company against its claim as a depositor. But it is impossible to treat the succession of the defendant to the Railway Company's claim as effecting such an absolute identification with the Railway Company that one and the same person insured the Bank and made the deposits. The doctrine of relation 'is a legal fiction invented to promote the ends of justice . . . . It is never allowed to defeat the collateral rights of third persons, lawfully acquired.' "

The cases of *Mack v. Woodruff*, 87 Ill. 570, and *Springfield National Bank v. American Surety Co. of New York*, 7 F. (2d) 44, also support plaintiff's position. In *Jenkins v. National Surety Company*, 277 U. S. 258, the surety predicated his rights upon an express contract of indemnity against liability. The Supreme Court, speaking through MR. JUSTICE STONE, said (267):

"Wherever equitable principles are called in play, as they preeminently are in determining the rights and liabilities of sureties and in the distribution of insolvents' estates, they likewise forbid the surety to secure by independent contract with the debtor indemnity at the expense of the creditor whose claim he has undertaken to secure."

 The right to setoff was unknown at common law. *Duncan Lumber Co. v. Leonard Lumber Co.*, 332 Ill. 104, 106; 57 C. J., p. 360. It originated in equity. From a very early date courts of equity were accustomed to grant relief in that regard independently as well as in aid of statutes upon the subject. *Scott v. Armstrong, supra*. In the development of the statutory law of setoff, equities have played an important role. The insurance policy sued on in the instant case was issued pursuant to the mandate of section 6 of the Currency Exchange Act. The bonds in connection with which defendant predicates its setoff were issued pursuant to the mandate of section 5 of that Act. Section 5 states that such bonds shall run to the State of Illinois and shall be for the benefit of certain classes of creditors of the exchange. Section 6 requires a policy or policies which shall insure the exchange against certain risks, including larceny and embezzlement. Section 7 requires the exchange to keep on hand or have available at all times a certain minimum amount of its own cash. The statute constitutes a part of the

384

bond and policy of insurance. *People v. G. H. Cross Co.*, 361 Ill. 405, 419. The purpose of this legislative policy was to insure the financial stability of currency exchanges, so that the public dealing with them and intrusting funds to them would not suffer loss. We agree with plaintiff that while section 6 required the insurance to be in the name of the exchange, it was intended to provide a fund for the payment of creditors of the exchange in the event of the happening of the contingencies insured against. In *McDougall v. Lueder*, 389 Ill. 141, it was contended that sections 5, 6 and 7 of the Currency Exchange Act were unconstitutional. In overruling this contention the Supreme Court said that any business conducted ''primarily or entirely by accepting funds of other people, undertaking to keep the funds intact for an indefinite length of time, and the purchasing of paper, such as cashing checks or money orders, is one in which the public deserves more protection than only the judgment, skill and good luck of the proprietor to protect against loss,'' and that ''reasonable regulation thereof falls within the powers of the legislature in the interests of the public safety.''

Defendant calls attention to the fact that the Currency Exchange Act does not forbid the surety who signs the annual license bond required by section 5 from issuing the blanket bond or policy of insurance required by section 6, and concludes that in providing for the giving of an annual license bond with surety the legislature contemplated that a principal and surety relationship exist between the parties to such bond under which the currency exchange, as principal, would be bound by express or implied contract obligations to exonerate, indemnify and reimburse the surety against liability or loss. Plaintiff does not contend that the surety could not sign both kind of undertakings. We

are convinced that the equities are with the plaintiff. Paraphrasing the language of MR. JUSTICE CARDOZO in *American Surety Co. v. Westinghouse Electric Mfg. Co.,* 296 U. S. 133, 139, through the bond and the statute a new relation has been established with a new set of equities, not subject to destruction at the pleasure of the principal. A careful examination of the cases cited and the statute satisfies us that regardless of whether the surety relies upon subrogation or indemnity, it cannot take priority with regard to the insurance fund. To do so would give it an unlawful preference.

Defendant may file its claim for allowance in the receivership proceeding against the estate. The order from which this appeal is prosecuted does not affect the right of the surety to file its claim in that proceeding. In *Mack v. Woodruff,* 87 Ill. 570, the court, in denying the right of setoff, said that the debtor should be permitted to retain a pro rata share and pay the balance to the estate without requiring him to prove his claim, pay the administrator the fund, and then draw back from it his pro rata share. In our opinion the orderly administration of the receivership estate requires that defendant's claim be adjudicated in that proceeding. Immediately prior to plaintiff's appointment as a receiver there were two types of creditors of the exchange. The claims of these creditors total $5,486.86 and were allowed by order entered in the receivership proceedings. These claims were secured by the $7,000 annual license bonds. All of such claims have been fully paid by the surety. The record is silent as to whether there are other prereceivership creditors of the exchange. The allegations of the surety's counterclaim are taken most strongly against it. The expenses of the receivership and the other expenses of administration are unknown at this time.

We are of the opinion that the order of the circuit court of Cook county is right. Therefore, it is affirmed.

*Order affirmed.*

FRIEND, J. and NIEMEYER, J., concur.