MOREY, AUDITOR OF PUBLIC ACCOUNTS OF ILLINOIS, ET AL. *v.* DOUD ET AL., DOING BUSINESS AS BONDIFIED SYSTEMS, ET AL.

No. 475.   Argued April 24, 1957.—Decided June 24, 1957.

458

*William C. Wines,* Assistant Attorney General of Illinois, argued the cause for appellants. With him on the brief were *Latham Castle,* Attorney General, *Ben Schwartz,* Assistant Attorney General, and *Benjamin S. Adamowski.*

*G. Kent Yowell* and *John J. Yowell* argued the cause and filed a brief for appellees.

MR. JUSTICE BURTON delivered the opinion of the Court.

This case concerns the validity of a provision in the Illinois Community Currency Exchanges Act, as amended,[1] excepting money orders of the American Express Company from the requirement that any firm selling or issuing money orders in the State must secure a license and submit to state regulation. The objection raised is that this exception results in a denial of equal protection of the laws, guaranteed by the Fourteenth Amendment to the Constitution of the United States, to those who are subjected to the requirements of the Act. For the reasons hereafter stated, we hold that the Act is invalid as applied to them because of this discriminatory exception.

The appellees in this case are Doud, McDonald and Carlson, partners doing business as Bondified Systems,

---

[1] Ill. Rev. Stat., 1955, c. 16½, §§ 30–56.3.

and Derrick, their agent. The partnership has an exclusive right to sell "Bondified" money orders in Illinois, directly or through agents.[2] It contemplates selling these money orders in Illinois through agents principally engaged in operating retail drug or grocery stores. Derrick is the proprietor of a drugstore in Illinois and operates a "Bondified" agency in that store.

Fearing enforcement against them of the provisions of the Act, these four individuals instituted this suit in the United States District Court for the Northern District of Illinois against the appellants, who are the Auditor of Public Accounts of the State of Illinois, the Attorney General of that State, and the State's Attorney of Cook County. The complaint alleged that the Act violated the Equal Protection Clause of the Fourteenth Amendment in that it unlawfully discriminated against the complainants and in favor of the American Express Company. An injunction against the enforcement of the Act was sought. Since the complaint attacked the validity of a state statute under the Constitution of the United States, the case was heard by a three-judge District Court, pursuant to 28 U. S. C. §§ 2281, 2284.

After hearing evidence, the District Court dismissed the complaint on the ground that it lacked jurisdiction to determine the constitutional question in the absence of an authoritative determination of that question by the Supreme Court of Illinois. 127 F. Supp. 853. On appeal, this Court held that the District Court erred in dismissing the case for lack of jurisdiction, and remanded it to the District Court. 350 U. S. 485.

On remand, the District Court considered on the merits the evidence previously heard, and unanimously held that

---

[2] The registered trade-mark "Bondified" is owned by Checks, Incorporated, a Minnesota corporation, and the partnership, Bondified Systems, has acquired an exclusive license to use that trade-mark in selling and issuing money orders.

460

the Act violated the Equal Protection Clause and that appellees were entitled to the relief sought. 146 F. Supp. 887.[3] The decree enjoined appellants from enforcing the Act against appellees so long as they engage only in the business of issuing and selling money orders. The case came here on direct appeal under 28 U. S. C. § 1253, and we noted probable jurisdiction. 352 U. S. 923.

During the early 1930's, the closing of many banks in the Chicago area led to the development of simple banking facilities called currency exchanges. The principal activities of these exchanges were the cashing of checks for a fee and the selling of money orders. The fact that many of these exchanges went into business without adequate capital and without sufficient safeguards to protect the public resulted in the enactment of the Illinois Community Currency Exchanges Act in 1943.

This Act and its amendments provide a comprehensive scheme for the licensing and regulation of currency exchanges. The operation of a community currency exchange without a license is made a crime. § 32. An applicant for a license must submit specified information and pay an investigation fee of $25. § 34. A license cannot be issued unless the State Auditor determines that its issuance will "promote the convenience and advantage of the community in which the business of the applicant is proposed to be conducted . . . ." § 34.1.[4] A surety bond of between $3,000 and $25,000, and an insurance policy of between $2,500 and $35,000 must be

[3] In so holding, the District Court declined to follow the Supreme Court of Illinois in sustaining the Act against a similar attack. *McDougall* v. *Lueder*, 389 Ill. 141, 58 N. E. 2d 899. It accepted instead the precedent of a three-judge Federal District Court in Wisconsin which had held unconstitutional an identical provision of a Wisconsin statute. *Currency Services, Inc.* v. *Matthews*, 90 F. Supp. 40.

[4] See *Gadlin* v. *Auditor of Public Accounts*, 414 Ill. 89, 110 N. E. 2d 234.

filed. §§ 35, 36. An annual license fee of $50 is required. § 44.

A licensed exchange must maintain a minimum of $3,000 available in cash for the uses and purposes of its business, plus an amount of liquid funds sufficient to pay on demand all outstanding money orders issued. § 37. Each exchange must be an entity, financed and conducted as a separate business unit, and not conducted as a department of another business. No community currency exchange "hereafter licensed for the first time shall share any room with any other business, trade or profession nor shall it occupy any room from which there is direct access to a room occupied by any other business, trade or profession." § 38. Only one place of business may be maintained under one license, although more than one license may be issued to a licensee. § 43. Annual financial reports must be submitted and the State Auditor has a duty to investigate each exchange at least once a year. A fee of $20 must be paid for each day or part thereof of investigation. § 46.

The following definition of a "community currency exchange" is crucial to this case:

" 'Community currency exchange' means any person, firm, association, partnership or corporation, except banks incorporated under the laws of this State and National Banks organized pursuant to the laws of the United States, engaged at a fixed and permanent place of business, in the business or service of, and providing facilities for, cashing checks, drafts, money orders or any other evidences of money acceptable to such community currency exchange, for a fee or service charge or other consideration, *or engaged in the business of selling or issuing money orders under his or their or its name, or any other money orders (other than* United States Post Office money orders, *American Express Company money*

*order*[*s*], Postal Telegraph Company money orders, or Western Union Telegraph Company money orders), or engaged in both such businesses, or engaged in performing any one or more of the foregoing services." (Emphasis supplied.) § 31.[5]

As the activities of appellees concededly come within this definition of a "community currency exchange," the partnership and its druggist agent are subject to the licensing and regulatory provisions of the Act. Consequently, since the Act bars the sale of money orders as a part of another business, the partnership is precluded from establishing outlets for the sale of "Bondified" money orders in drug and grocery stores, and Derrick is unable to secure a license for the sale of those money orders in his store. § 38. Even if the partnership establishes outlets which are not a part of other businesses, those outlets will be licensed to sell "Bondified" money orders only if they show that the "convenience and advantage of the community" in which they propose to do business will be promoted by the issuance of licenses to them. § 34.1. Finally, any "Bondified" outlets will each have to pay the specified licensing and inspection fees and each will have to secure the required surety bond and insurance policy.

---

[5] Appellees do not question the exception from the Act of the money orders of the United States Post Office, the Postal Telegraph Company and the Western Union Telegraph Company. In *Currency Services, Inc.* v. *Matthews*, 90 F. Supp. 40, 43, a three-judge District Court upheld the exception of these money orders from a similar Wisconsin statute. The court concluded that the State was without authority to regulate the sale of the United States Post Office money orders, and that the exception of Western Union money orders was reasonable since that company was regulated both by the Federal Communications Commission and by a state commission. It noted that the Postal Telegraph Company has merged with the Western Union Telegraph Company.

The American Express Company, on the other hand, because its money orders are excepted, is relieved of these licensing and regulatory requirements, and appears to be exempt from any regulation in Illinois. The American Express Company, an unincorporated joint stock association organized in 1868 under the laws of New York, conducts a world-wide business which includes the sale of money orders. It sells money orders in Illinois in substantially the same manner as is contemplated by the "Bondified" partnership, through authorized agents located in drug and grocery stores. Since American Express money orders are not subject to the Act, they are sold legally in those stores as a part of their business. American Express outlets may be established without regard to the "convenience and advantage" of the community in which they operate. Finally, those outlets need not pay licensing and inspection fees nor file surety bonds and insurance policies with the State.

In determining the constitutionality of the Act's application to appellees in the light of its exception of American Express money orders, we start with the established proposition that the "prohibition of the Equal Protection Clause goes no further than the invidious discrimination." *Williamson* v. *Lee Optical Co.*, 348 U. S. 483, 489. The rules for testing a discrimination have been summarized as follows:

> "1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality.

3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary." *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, 78–79.

To these rules we add the caution that "Discriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision." *Louisville Gas Co.* v. *Coleman,* 277 U. S. 32, 37–38; *Hartford Co.* v. *Harrison,* 301 U. S. 459, 462.

The Act creates a statutory class of sellers of money orders. The money orders sold by one company, American Express, are excepted from that class. There is but one "American Express Company." If the exception is to be upheld, it must be on the basis on which it is cast—an exception of a particular business entity and not of a generic category.

The purpose of the Act's licensing and regulatory provisions clearly is to protect the public when dealing with currency exchanges.[6] Because the American Express Company is a world-wide enterprise of unquestioned solvency and high financial standing, the State argues that the legislative classification is reasonable. It contends that the special characteristics of the American Express Company justify excepting its money orders from the requirements of an Act aimed at local companies do-

[6] See *McDougall* v. *Lueder,* 389 Ill. 141, 149–150, 58 N. E. 2d 899, 903–904; *Willis* v. *Fidelity & Deposit Co.,* 345 Ill. App. 373, 384–385, 103 N. E. 2d 513, 518–519.

ing local business,[7] and that appellees are in no position to complain about competitive disadvantages since the "Fourteenth Amendment does not protect a business against the hazards of competition," citing *Hegeman Farms Corp.* v. *Baldwin,* 293 U. S. 163, 170.

That the Equal Protection Clause does not require that every state regulatory statute apply to all in the same business is a truism. For example, where size is an index to the evil at which the law is directed, discriminations between the large and the small are permissible.[8] Moreover, we have repeatedly recognized that "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 489. On the other hand, a statutory discrimination must be based on differences that are reasonably related to the purposes of the Act in which it is found.[9] *Smith* v. *Cahoon,* 283 U. S. 553, involved a state statute which required motor vehicles, operating on local highways as carriers for hire, to furnish bonds or insurance policies for the protection of the public against injuries received through negligence in these operations. The Act excepted motor vehicles carrying specified products. This Court held that

---

[7] See *McDougall* v. *Lueder,* 389 Ill. 141, 151, 58 N. E. 2d 899, 904.

[8] See *Engel* v. *O'Malley,* 219 U. S. 128, 138 (exception of businesses in which the average sum received for safekeeping or transmission was more than $500 from licensing requirements intended to protect the small depositor); see also, *New York, N. H. & H. R. Co.* v. *New York,* 165 U. S. 628 (exception of railroads less than 50 miles in length from a statute regulating the heating of railroad passenger cars and the placing of guards and guard posts on railroad bridges); *Miller* v. *Strahl,* 239 U. S. 426 (exception of hotels with less than 50 rooms from a statute requiring hotelkeepers to take certain fire precautions).

[9] See *F. S. Royster Guano Co.* v. *Virginia,* 253 U. S. 412, 415; *Louisville Gas Co.* v. *Coleman,* 277 U. S. 32, 37.

the exception violated the Equal Protection Clause since the statutory purpose of protecting the public could not reasonably support a discrimination between the carrying of exempt products like farm produce and of regulated products like groceries. " 'Such a classification is not based on anything having relation to the purpose for which it is made.' " *Id.*, at 567.

Of course, distinctions in the treatment of business entities engaged in the same business activity may be justified by genuinely different characteristics of the business involved.[10] This is so even where the discrimination is by name.[11] But distinctions cannot be so justified if the "discrimination has no reasonable relation to these differences." *Hartford Co.* v. *Harrison*, 301 U. S. 459, 463. In that case, this Court held that a state statute which permitted mutual insurance companies to act through salaried resident employees, but which excluded stock insurance companies from the same privilege, violated the Equal Protection Clause.

The principles controlling in the *Smith* and *Hartford Co.* cases, *supra*, are applicable here. The provisions in the Illinois Act, such as those requiring an annual inspection of licensed community currency exchanges by the State Auditor, make it clear that the statute was intended to afford the public *continuing* protection. The discrimination in favor of the American Express Company does not conform to this purpose. The exception of its money

---

[10] See *German Alliance Ins. Co.* v. *Lewis*, 233 U. S. 389 (exception of farmers' mutual insurance companies doing only farm business from a statute establishing rate regulation for fire insurance companies); *Hoopeston Canning Co.* v. *Cullen*, 318 U. S. 313 (different regulatory requirements for reciprocals and mutual companies).

[11] See *Erb* v. *Morasch*, 177 U. S. 584 (exception of a named railroad from an ordinance limiting the speed of trains in a city); cf. *Williams* v. *Mayor*, 289 U. S. 36.

orders apparently rests on the legislative hypothesis that the characteristics of the American Express Company make it unnecessary to regulate their sales. Yet these sales, by virtue of the exception, will continue to be unregulated whether or not the American Express Company retains its present characteristics. On the other hand, sellers of competing money orders are subject to the Act even though their characteristics are, or become, substantially identical with those the American Express Company now has. Moreover, the Act's blanket exception takes no account of the characteristics of the local outlets that sell American Express money orders, and the distinct possibility that they in themselves may afford less protection to the public than do the retail establishments that sell competing money orders. That the American Express Company is a responsible institution operating on a world-wide basis does not minimize the fact that when the public buys American Express money orders in local drug and grocery stores it relies in part on the reliability of the selling agents.

The effect of the discrimination is to create a closed class by singling out American Express money orders. The singling out of the money orders of one company is in a sense the converse of a case like *Cotting* v. *Kansas City Stock Yards Co.,* 183 U. S. 79, 114–115. See also, *McFarland* v. *American Sugar Co.,* 241 U. S. 79. In the *Cotting* case this Court held that a regulatory statute that in fact applied to only one stockyard in a State violated the Equal Protection Clause. Although statutory discriminations creating a closed class have been upheld,[12]

___

[12] See *Watson* v. *Maryland,* 218 U. S. 173 (exception of physicians who practiced prior to a specified date and treated at least 12 persons within a year prior thereto from examination and certificate requirements); *Sampere* v. *New Orleans,* 166 La. 776, 117 So. 827, aff'd *per curiam,* 279 U. S. 812 (exception of existing business establish-

a statute which established a closed class was held to violate the Equal Protection Clause where, on its face, it was "an attempt to give an economic advantage to those engaged in a given business at an arbitrary date as against all those who enter the industry after that date." *Mayflower Farms, Inc.* v. *Ten Eyck,* 297 U. S. 266, 274. The statute involved in that case granted a differential from the regulated price at which dealers could sell milk to those dealers in a specified class who were in business before April 10, 1933.

Unlike the American Express Company, appellees and others are barred from selling money orders in retail establishments. Even if competing outlets can successfully be established as separate businesses, their ability to secure licenses depends upon a showing of "convenience and advantage." Perhaps such a showing could not be made because the unregulated American Express Company had already established outlets in the community. And even if licenses were secured, the licensees would be required to pay licensing and investigatory fees and purchase surety bonds and insurance policies—costs that the American Express Company and its agents are not required to bear.[13] The fact that the activities of the American Express Company are far-flung does not minimize the impact on local affairs and on competitors of its sale of money orders in Illinois. This is not a case in which the Fourteenth Amendment is being invoked to protect a business from the general hazards of competi-

---

ments from a zoning restriction); *Stanley* v. *Public Utilities Commission,* 295 U. S. 76 (exception of carriers which had furnished adequate, responsible and continuous service over a given route from a specified date in the past from the requirement of showing public convenience and necessity to secure a license).

[13] See *Currency Services, Inc.* v. *Matthews,* 90 F. Supp. 40, 44, n. 2, to the effect that costs such as these may be prohibitive.

tion.    The hazards here have their roots in the statutory discrimination.

Taking all of these factors in conjunction—the remote relationship of the statutory classification to the Act's purpose or to business characteristics, and the creation of a closed class by the singling out of the money orders of a named company, with accompanying economic advantages—we hold that the application of the Act to appellees deprives them of equal protection of the laws.[14]

The State urges that if the exception of American Express money orders is unconstitutional, the case should be remitted to the Illinois courts for a determination whether the exception can be severed from the Act under its severability clause.    § 56.3.    However, even if such

---

[14] In *Wedesweiler* v. *Brundage*, 297 Ill. 228, 130 N. E. 520, the Supreme Court of Illinois held that the Equal Protection Clause was violated by a statute which excepted express, steamship and telegraph companies from its prohibition against the transmission of money to foreign countries by natural persons, firms or partnerships.    That court concluded that the discrimination "has no reference to character, solvency, financial responsibility, security, business or monetary facilities, incorporation, method of doing business, public inspection, supervision or report, or any other thing having any relation to the protection of the public from loss by reason of the dishonesty, incompetence, ignorance or irresponsibility of persons engaging in that business."    297 Ill., at 237, 130 N. E., at 523.    See also, *State on inf. Taylor* v. *Currency Services, Inc.*, 358 Mo. 983, 218 S. W. 600.

The *Wedesweiler* case was distinguished by the Supreme Court of Illinois in *McDougall* v. *Lueder*, 389 Ill. 141, 150, 58 N. E. 2d 899, 904, on the ground that in the earlier case the regulated firms were "in direct competition" with the excepted companies.    Apparently the court treated the regulated firm in the *McDougall* case as not being in direct competition with the American Express Company since the firm was engaged in the business of cashing checks, as well as in that of selling money orders, while the American Express Company merely sold money orders.    Such a distinction is not involved in the facts of this case and we express no opinion on it.

a procedure is otherwise appropriate,[15] we deem it unnecessary here since the Supreme Court of Illinois has indicated rather clearly that the exception is not severable.[16] The State also contends that appellees do not come into court with clean hands and have not demonstrated the imminence of irreparable injury, and hence that they are not entitled to equitable relief. These arguments are adequately disposed of in the opinion of the District Court.[17]

The judgment of the District Court is

*Affirmed.*

Mr. Justice Black, dissenting.

The Illinois statute involved here provides a state-wide regulatory plan to protect the public from irresponsible and insolvent sellers of money orders. The Act specifically exempts the American Express Company's money orders from its regulatory provisions because, as the Court recognizes, that company "is a world-wide enter-

[15] See *Guinn* v. *United States*, 238 U. S. 347, 366; *Myers* v. *Anderson*, 238 U. S. 368, 380–381; *Dorchy* v. *Kansas*, 264 U. S. 286, 291.

[16] In *McDougall* v. *Lueder*, 389 Ill. 141, 151, 58 N. E. 2d 899, 904, the Supreme Court of Illinois stated that "The General Assembly would surely never have passed the act if they had thought that the said companies [Western Union, Postal Telegraph and American Express] would be made subject to its rules and regulations." This statement takes on added significance in the light of the court's ruling in the same case that another provision of the Act, which it held invalid, could be severed since "there is no presumption that the General Assembly would not have enacted the remainder of the statute without" the invalid provision. 389 Ill., at 155, 58 N. E. 2d, at 906.

As the question of severability is a question of state law, the judgment of the Supreme Court of Illinois is binding here. See *Dorchy* v. *Kansas*, 264 U. S. 286, 290; *Chas. Wolff Packing Co.* v. *Court of Industrial Relations*, 267 U. S. 552, 562.

[17] See *Doud* v. *Hodge*, 146 F. Supp. 887, 889–890.

prise of unquestioned solvency and high financial standing." I cannot agree with the Court that this exemption denies actual and potential competitors of the American Express Company equal protection of the laws within the meaning of the Fourteenth Amendment. Only recently this Court held that "[t]he prohibition of the Equal Protection Clause goes no further than the invidious discrimination." *Williamson* v. *Lee Optical of Oklahoma, Inc.*, 348 U. S. 483, 489. And here, whatever one may think of the merits of this legislation, its exemption of a company of known solvency from a solvency test applied to others of unknown financial responsibility can hardly be called "invidious." Unless state legislatures have power to make distinctions that are not plainly unreasonable, then the ability of the States to protect their citizens by regulating business within their boundaries can be seriously impaired. I feel it necessary to express once again my objection to the use of general provisions of the Constitution to restrict narrowly state power over state domestic economic affairs.[1]

I think state regulation should be viewed quite differently where it touches or involves freedom of speech, press, religion, petition, assembly, or other specific safeguards of the Bill of Rights. It is the duty of this Court to be alert to see that these constitutionally preferred rights are not abridged.[2] But the Illinois statute here

---

[1] See, *e. g.*, my dissents in *H. P. Hood & Sons* v. *Du Mond,* 336 U. S. 525, 562–564; *Magnolia Petroleum Co.* v. *Hunt,* 320 U. S. 430, 462; *Adamson* v. *California,* 332 U. S. 46, 79–84. Cf. *Tigner* v. *Texas,* 310 U. S. 141; *American Sugar Refining Co.* v. *Louisiana,* 179 U. S. 89, 92; *Slaughter-House Cases,* 16 Wall. 36, 81–82.

[2] *Schneider* v. *State,* 308 U. S. 147, 161. And see my dissenting opinions in *Beauharnais* v. *Illinois,* 343 U. S. 250, 267, and *Feldman* v. *United States,* 322 U. S. 487, 494. Cf. *Kotch* v. *Board of River Port Pilot Comm'rs,* 330 U. S. 552, 556; and my concurring opinion in *Oyama* v. *California,* 332 U. S. 633, 647.

does not involve any of these basic liberties. And since I believe that it is not "invidiously discriminatory," I would not hold it invalid.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE HARLAN joins, dissenting.

The sole question before the Court is whether the Fourteenth Amendment of the United States Constitution, in prohibiting a State from denying any person "the equal protection of the laws," has barred Illinois from formulating its domestic policy as it did, in an area concededly within the regulatory power of that State. As is usually true of questions arising under the Equal Protection Clause, the answer will turn on the way in which that clause is conceived. It is because of differences in judicial approach that the divisions in the Court in applying the clause have been frequent and marked. It is, I believe, accurate to summarize the matter by saying that the great divide in the decisions lies in the difference between emphasizing the actualities or the abstractions of legislation.

The more complicated society becomes, the greater the diversity of its problems and the more does legislation direct itself to the diversities. Statutes, that is, are directed to less than universal situations. Law reflects distinctions that exist in fact or at least appear to exist in the judgment of legislators—those who have the responsibility for making law fit fact. Legislation is essentially empiric. It addresses itself to the more or less crude outside world and not to the neat, logical models of the mind. Classification is inherent in legislation; the Equal Protection Clause has not forbidden it. To recognize marked differences that exist in fact is living law; to disregard practical differences and concentrate on some abstract identities is lifeless logic.

The controlling importance of the differences in approach to a problem arising under the Equal Protection Clause is sharply illustrated by one's view of the decisions in cases like *Louisville Gas Co.* v. *Coleman,* 277 U. S. 32, and *Hartford Co.* v. *Harrison,* 301 U. S. 459. The Court relies on them. For me they are false leads. Both these decisions prevailed by the narrowest margin; both evoked powerful dissents; both manifest the requirement of nondiscriminatory classification as an exercise in logical abstractions. They breathe the spirit of decisions like *Connolly* v. *Union Sewer Pipe Co.,* 184 U. S. 540, and *Colgate* v. *Harvey,* 296 U. S. 404, which were respectively overruled in *Tigner* v. *Texas,* 310 U. S. 141, and *Madden* v. *Kentucky,* 309 U. S. 83. The last two cases heeded the admonition that "it is important for this court to avoid extracting from the very general language of the Fourteenth Amendment a system of delusive exactness . . . ." *Louisville & Nashville R. Co.* v. *Barber Asphalt Co.,* 197 U. S. 430, 434.

In regulating its banking facilities, Illinois was drawing on one of the oldest and most far-reaching of legislative powers. The public needs to be protected in the issuing and selling of money orders, and people with limited means are especially to be safeguarded. If Illinois chose, the State itself could take over the money order business. See *Noble State Bank* v. *Haskell,* 219 U. S. 104, 113. Just as it was found that there was nothing in the Constitution of the United States to bar a State from engaging in the businesses of manufacturing and marketing farm products and of providing homes for its people, *Green* v. *Frazier,* 253 U. S. 233, so, surely, there is nothing to prevent Illinois from engaging in this business directly, or through a money dispensary similar to the mode by which some States engage in the liquor business. I know of nothing in the Fourteenth Amendment that would bar the State from discharging its responsibility to

its citizens by having the business conducted by what the Court recognizes to be "a world-wide enterprise of unquestioned solvency and high financial standing," to wit, the American Express Co.

I regretfully find myself unable to appreciate why the State, instead of thus dealing with the problem, may not choose to allow small units to carry on a business so fraught with public interests under the regulations devised by the statute under review, while at the same time it finds such measures of control needless in a case of "a world-wide enterprise of unquestioned solvency and high financial standing." The rational differentiation is of course that the latter enterprise contains within itself, in the judgment of Illinois, the necessary safeguards for solvency and reliability in issuing money orders and redeeming them. Surely this is a distinction of significance in fact that the law cannot view with a glass eye.

But it is suggested that the American Express Co. may not continue to retain "its present characteristics," while sellers of competing money orders may continue to be subject to the Act, even though their characteristics become "substantially identical with those the American Express Co. now has." What is this but to deny a State the right to legislate on the basis of circumstances that exist because a State may not in speculatively different circumstances that may never come to pass have such right? Surely there is time enough to strike down legislation when its constitutional justification is gone. Invalidating legislation is serious business and it ought not to be indulged in because in a situation not now before the Court, nor even remotely probable, a valid statute may lose its foundation. The Court has had occasion to deal with such contingency more than once. Regulatory measures have been sustained that later, in changed circumstances, were found to be unconstitutional. Compare *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19,

with *Newton* v. *Consolidated Gas Co.*, 258 U. S. 165, and *Block* v. *Hirsh*, 256 U. S. 135, with *Chastleton Corp.* v. *Sinclair*, 264 U. S. 543.

" 'Legislation which regulates business may well make distinctions depend upon the degree of evil.' *Heath & Milligan Mfg. Co.* v. *Worst*, 207 U. S. 338, 355, 356. It is true, no doubt, that where size is not an index to an admitted evil the law cannot discriminate between the great and small. But in this case size is an index." *Engel* v. *O'Malley*, 219 U. S. 128, 138. Neither the record nor our own judicial information affords any basis for concluding that Illinois may not put the United States Post Office, the Western Union Co., and the American Express Co. in one class and all the other money order issuers in another. Illinois may not the less relieve the American Express Co. from regulations to which multitudinous small issuers are subject because that company has its own reliabilities that may well be different from those of the United States Post Office and the Western Union Telegraph Co. The vital fact is that the American Express Co. is decisively different from those money order issuers that are within the regulatory scheme.

Sociologically one may think what one may of the State's recognition of the special financial position obviously enjoyed by the American Express Co. Whatever one may think is none of this Court's business. In applying the Equal Protection Clause, we must be fastidiously careful to observe the admonition of Mr. Justice Brandeis, Mr. Justice Stone, and Mr. Justice Cardozo that we do not "sit as a super-legislature." (See their dissenting opinion in the ill-fated case of *Colgate* v. *Harvey*, 296 U. S. 404, 441. See also *Asbury Hospital* v. *Cass County*, 326 U. S. 207, 214–215.)