Fuld, J.
This appeal, here as of right on constitutional grounds, poses important questions in the administration of provisions of the Agriculture and Markets Law relating to the licensing and regulation of persons engaged in business as milk dealers.
The defendant Champlain Creameries, a milk handler and manufacturer, purchases milk from nearly 700 independent milk producers, several co-operative associations (composed of individual producers) and a number of other dealers and, in so doing, is subject to regulation by the Department of Agriculture and Markets under the various provisions of article 21 of the Agriculture and Markets Law. One of these provisions, section 258-b, requires a milk dealer — defined as one who buys milk from, among others, independent producers and ‘ ‘ co-opera *467 tive association[s] ” (§ 258-b, subd. 4)—as a predicate to obtaining an annual license, to execute and file a surety bond to secure “ the prompt payment of all amounts due to producers ” for milk bought by the dealer during the license period (§ 258-b, subd. 1). However, under one of the subdivisions of section 258-b, the Commissioner of Agriculture and Markets may permit the dealer, in lieu of filing a surety bond, to deposit cash or government bonds to “ afford producers the protection intended by this section” (§ 258-b, subd. 5). Another subdivision further empowers the Commissioner to require the dealer to “ give an additional bond” if it be determined “ that the security afforded to producers * * * by the [existing] bond does not adequately protect such producers” (§ 258-b, subd. 3). In accordance with these provisions, the defendant presently has on deposit New York State and United States Government bonds with a face value of $180,000 and a current market value of somewhere between $112,000 and $114,000.
In the course of processing the defendant’s application for a license for the year beginning April 1, 1963, the Commissioner reviewed its financial situation and ascertained that the volume of milk purchased by the defendant had risen sharply and that there was a consequent increase in the amount of money it owed to producers. The Commissioner found that, in addition to showing a deficit of $265,000 in current liabilities over current assets, the defendant, in the period of one year, incurred a monthly indebtedness of between $473,000 and $672,000 on purchases of milk from independent producers alone — exclusive of co-operatives and other dealers — and an indebtedness, in any one week of a typical month, of about $235,000 on purchases from all three sources.
On the basis of these findings, the Commissioner, acting pursuant to subdivision 3 of section 258-b, demanded that the defendant deposit additional bonds so as to increase its total security from the face amount of $180,000 to $500,000. When the defendant failed to comply with this demand, the Commissioner, invoking the new provisions of subdivision 7 of section 258-b, which became effective on April 1, 1963, directed the defendant, in lieu of posting additional bonds, to deposit funds in an escrow account in a bank of its choice so as to remedy *468 the inadequacy of its existing security.[1] The Commissioner, pursuant to that subdivision, required the defendant to pay each week into an escrow fund ‘ ‘ an amount equal to the value of milk received by [it] during the preceding seven days ” from independent producers and co-operative associations. Upon making payment “ to [its] producers or to a cooperative association of producers for milk purchased from them or it ”, the defendant would be entitled, as the section reads, to “ draw [its] payment checks against [its] moneys in the escrow account subject to the commissioner’s audit and approval ”.
Then, when the defendant refused to comply with this second directive, the Commissioner, acting pursuant to section 258-e, brought the present action for an injunction prohibiting the defendant from carrying on its milk business unless it set up the required escrow account. The injunctive relief sought was granted at Trial Term and, following the Appellate Division’s unanimous affirmance, the defendant appealed to this court, as indicated above, as of right on constitutional grounds (CPLR5601 [b] [1]).
Simply stated, it is the defendant’s assertion that subdivision 7 of section 258-b, which provides for the establishment of the escrow account, is, both on its face and as applied to it, violative of the due process and equal protection clauses of the Federal and State Constitutions. More specifically, the defendant argues that (1) the section results in a taking of its *469 property without due process of law insofar as it authorizes the Commissioner to demand that a milk dealer establish an escrow account not merely as an alternative but in addition to the security bonds then on deposit; (2) that the Legislature’s failure to include in the section “ any guide lines ” for the Commissioner to follow in determining whether or when to require the added protection of an escrow account likewise renders the section subject to attack on due process grounds; (3) that the section denies it the equal protection of the laws by permitting the Commissioner, in his discretion, to allow a dealer financially unable to comply with the bonding requirements to put up only the seven-day escrow account and thus place a financially unstable dealer in a far better competitive position than a dealer, such as the defendant, who is required both to deposit bonds and to set up an escrow fund; and (4) that, since the section authorizes the Commissioner to require an escrow account to include funds to cover milk purchased only from independent producers, his direction that the defendant also include in such account funds covering purchases from co-operative associations is arbitrary and unreasonable and constitutes a denial of due process.
There can be no doubt of the' power of the State to regulate the milk industry not only to protect the public health and welfare but also to assure to milk producers payments due them from those dealers who purchase their milk. (See People v. Beakes Dairy Co., 222 N. Y. 416; People v. Perretta, 253 N. Y. 305; see, also, Hood & Sons v. Du Mond, 336 U. S. 525, 529-530.) In the Beakes case (supra), this court expressly held that section 55 of the Agricultural Law, the source of present section 258-b, did not violate the constitutional demands of due process or equal protection when, among other things, it required a milk dealer seeking a license to initially post a “surety bond” or “deposit * * * money or securities” in an amount equal to the required bond to secure “ the payment of all amounts due to persons who have sold milk or cream ” to the dealer during the license period; empowered the Commissioner, should he determine that “the bond executed or deposit made * * * does not adequately protect such vendors ’ ’, to require the dealer ‘ ‘ to give an additional bond or to deposit additional moneys or securities ”; and permitted the *470 Commissioner to waive the requirement of a bond or other security should he be satisfied that a particular dealer ‘[1] is solvent and possessed of sufficient assets to reasonably assure compensation to probable creditors ”. Likewise, in the Perretta case (253 N. Y. 305, supra), the court sustained section 252 of the Agriculture and Markets Law—an almost identical re-enactment of section 55 and thus another forerunner of present section 258-b — as a reasonable and legitimate exercise of the State’s police power.
In light of these decisions, we perceive no merit in the defendant’s present challenge to subdivision 7 of section 258-b. That subdivision, which was added to the statute in 1963, represents no more than an extension of the security provisions then contained in section 258-b in order to assure adequate security to persons selling milk to dealers. This being so, the constitutionality of subdivision 7, so far as due process and equal protection of the laws is concerned, is firmly established by our decisions in the Beakes and Perretta cases (supra).
In both of those cases, as previously indicated, the court held that there was no constitutional infirmity in the provisions authorizing the Commissioner to insist that a milk dealer ‘ ‘ give an additional bond or * * * deposit additional moneys or securities ” if he determined that the security of producers so required (Agricultural Law, § 55, now Agriculture and Markets Law, § 258-b, subd. 3). Subdivision 7 does no more than place at the Commissioner’s disposal an alternative method, i.e., the escrow account, for guaranteeing that milk producers will be adequately protected should their sales to a dealer at any time total an amount greatly in excess of the latter’s existing security. It follows, therefore, that our prior holdings directly refute the defendant’s argument that the demand for an escrow account in addition to its existing security is violative of due process.
Moreover, it should be noted that, since the Commissioner, under subdivision 3 of section 258-b and its forerunners, could have chosen — as, in fact, he did in a prior directive (supra, p. 467)—to require the defendant to post additional bonds to remedy its inadequate security, the defendant has no ground for complaint. Quite obviously, as the trial court recognized, the revolving, seven-day escrow account, when looked at from the *471 dealer’s point of view, represents a far less drastic method of assuring protection to the producer than would a demand for additional bonds: compliance with the latter demand would, in effect, tie up a larger portion of the dealer’s assets and for a longer period of time, namely, the license term of one year.
That subdivision 7 actually does, contrary to the defendant’s suggestion, empower the Commissioner to demand the escrow account in addition and not merely as an alternative to the security afforded by the surety bond or government bonds on deposit is beyond dispute. The Legislature clearly contemplated that the escrow account would, as the very language of the subdivision reflects, add a measure of protection ‘ ‘ not adequately guaranteed ’ ’ by the existing security arrangements, that it would remedy the inadequacy of, not replace, the surety bond or government securities. Standing alone, those two protective devices might be insufficient to secure the full amount of the sales made to the dealer. By the same token, inasmuch as subdivision 7 provides for payment into the escrow account of only an amount equal to the value of milk received ‘ ‘ during the preceding seven days ” and thus, as the trial court noted, there is always a hiatus in security for a week’s purchases, such an account would not, in and of itself, afford the producers complete protection. In short, the various security devices provided in section 258-b were designed to complement each other.
Nor may it be said that subdivision 7 is devoid of “guide lines ” to govern the Commissioner in implementing its terms. As the section itself makes clear, the determinative factor is the “financial condition” of the dealer, its ability to assure payment to producers with whom it deals. It is this exact standard which underlies each of the statute’s security devices (see § 258-b, subds. 1, 3, 5) and which this court sustained in the Beakes and Perretta cases. Since a dealer is “ required ” periodically to file ‘ ‘ a verified statement of his disbursements ’ ’, showing “ the amount due to the producers ” (§ 258-b, subd. 3), the Commissioner is in a position to gouge the financial condition of any dealer and the consequent security needs of producers selling it milk. That Champlain’s volume of business and its general financial situation justified the Commissioner in requiring an escrow account to supplement the existing security *472 of $180,000 in government bonds is convincingly shown both by the figures set out above and the more detailed account appearing in the papers on appeal. In view of these facts, the Commissioner’s actions with respect to this defendant cannot be deemed arbitrary or unreasonable.
The defendant’s further contention that subdivision 7 denies it “ the equal protection of the laws” also lacks substance. The subdivision does, in part, declare that, “ whenever the commissioner shall determine that a milk dealer buying milk from producers * * * has been unable to obtain a surety bond and cannot be relieved from the provisions of this section as provided in subdivision five hereof, the commissioner may require such milk dealer to [establish] * * * an escrow fund ’ ’. Although one might conclude from a mere reading of this clause, without regard to the provisions of the other subdivisions of section 258-b and of other related sections, that the Commissioner is thereby authorized to waive the requirement of a surety bond (or securities in lieu thereof) and demand only the establishment of a seven-day escrow account in the case of a financially unstable dealer, such a construction is highly unnatural and unreasonable, at odds with the over-all tenor of article 21 of the Agriculture and Markets Law.
The objective of that article is to assure not only that persons licensed as milk dealers are, by character and reputation, properly suited to conduct such business but also that they possess a degree of “ financial responsibility ” sufficient to “ afford producers the protection intended ’ ’ by the Legislature, namely, assurance of ‘ ‘ prompt payment of all amounts due [them] * * * for milk sold or consigned * * * to such licensee ” (§§ 258-c, 258-b, subds. 1, 5). As noted above, subdivision 7 is merely an extension of the existing statutory pattern by which the Commissioner is given the necessary discretion to vary the security required of a dealer in accordance with the latter’s particular financial situation. Considered as a part of that statutory scheme, the subdivision does not change the amount of security which a dealer may ultimately be called upon to furnish; rather, it merely supplies the Commissioner with a further form of security which he may choose to utilize in an effort to provide producers with “ total security ”.
*473 It is unlikely, therefore, that the Legislature, in enacting subdivision 7, intended — or that the Commissioner, in implementing its terms, would determine — that a dealer so financially weak as to be unable to secure by bond even one week’s purchases of milk should be permitted to operate as a licensed milk dealer with only the incomplete security of the seven-day escrow account to protect his producers. When the particular clause of subdivision 7, relied upon by the defendant, is read in conjunction with the rest of section 258-b, it becomes readily apparent that the Legislature meant by that clause only to authorize the Commissioner to allow a milk dealer to operate without a bond or other security aside from the escrow account if that dealer’s business and financial conditions are such that no further measures are required to adequately protect his producers.
In the last analysis, the determinative factor is the financial condition and nature of each dealer’s business. Since this is so, since, in other words, the security required of all dealers is measured—whether under subdivision 7 or under the other security provisions of section 258-b — against this one common standard, there is no denial of equal protection of the laws. (See Matter of Engelsher v. Jacobs, 5 N Y 2d 370, 374, cert. den. 360 U. S. 902; People v. Perretta, 253 N. Y. 305, supra; People v. Beakes Dairy Co., 222 N. Y. 416, supra; see, also, Ferguson v. Skrupa, 372 U. S. 726, 732; Morey v. Doud, 354 U. S. 457, 463-464.)
The defendant’s final argument—that the Commissioner may not require the escrow account to include funds to cover its purchases from co-operative associations—may be quickly answered. Subdivision 4 of section 258-b specifically provides that, ‘ ‘ whenever protection by bond or otherwise is directed by the commissioner to protect the interests of producers * * * [t]he provisions of this article relative to a milk dealer buying milk from producers * * * shall apply also to [one] * * * buying milk from a co-operative association ”. (Emphasis supplied.) Moreover, subdivision 7 itself, although it does not mention co-operatives in providing for the payment of funds in escrow, does provide that, “ [w]henever such milk dealer makes his payment to his producers or to a cooperative association of producers for milk purchased from *474 them, or it, he may draw Ms payment checks against his moneys in the escrow account”. (Emphasis supplied.) If the Legislature had intended to afford security only for independent producers and to exclude co-operatives from the protection of the fund, it is inconceivable that it would have allowed a dealer to deplete the fund by withdrawals for payments to co-operatives, for this would jeopardize the security of such producers for the benefit of an unprotected class.
The order appealed from should be affirmed, without costs.
Chief Judge Desmond and Judges Dye, Van Voorhis, Burke, Scileppi and Bergan concur.
Order affirmed.

. Subdivision 7, insofar as here relevant, reads as follows:
“ Whenever the commissioner shall determine that the financial condition of a milk dealer is such that the protection afforded to producers selling milk to such milk dealer is not adequately guaranteed by the bond filed pursuant to this section or by the cash or bonds of the United States or state of New York deposited in lieu thereof, or whenever the commissioner shall determine that a milk dealer buying milk from producers subject to this section has been unable to obtain a surety bond and cannot be relieved from the provisions of this section as provided in subdivision five hereof, the commissioner may require such milk dealer to pay each week into an escrow fund established by the commissioner and maintained under his supervision and control an amount equal to the value of milk received by such milk dealer during the preceding seven days as reckoned from a date fixed by the commissioner. * * * Whenever such milk dealer makes his payment to his producers or to a cooperative association of producers for milk purchased from them or it, he may draw his payment cheeks against his moneys in the escrow account subject to the commissioner’s audit and approval.”