## HARVE JOHNSON v. STATE.

No. A-4190.   Opinion Filed March 15, 1924.
(223 Pac. 890.)

(Syllabus.)

1.   **Appeal and Error—Harmless Error—Manner of Introduction of Testimony.** An accused person cannot complain of the rejection of testimony offered in proper form, where the court permits the introduction of the identical evidence in an irregular way. Where the facts are fairly before the jury the manner or form of introduction is immaterial.

2.   **Trial—Refusal to Delay Trial, after Testimony in, to Secure Another Reporter, Held Proper.** Under the circumstances shown, the refusal of the court to delay the trial, after all the testimony had been heard, until another court reporter could be secured, was proper.

3.   **Trial—Remarks in Argument not Prejudicial.** Alleged improper remarks of counsel for the state held harmless.

4.   **Trial—Alleged Misconduct of Jurors Insufficient for Reversal.** Held, that certain irregularities in the conduct of the jurors were of such slight importance as not to warrant a reversal of the cause.

Appeal from District Court, Delaware County; H. L. Marshall, Special Judge.

Harve Johnson was convicted of manslaughter in the first degree, and he appeals. Affirmed.

W. W. Hastings and Miller & Miller, for plaintiff in error.

The Attorney General, and J. Roy Orr, Asst. Atty Gen., for the State.

BESSEY, J.  This is an appeal from a judgment of the district court of Delaware county upon a verdict of a jury rendered October 21, 1921, against plaintiff in error, Harve Johnson, here referred to as the defendant, fixing his punishment at confinement in the state penitentiary for a term of 20 years.

The information charged the defendant with the murder of Lum Moore on the 29th day of April, 1913. At the preliminary trial, held soon thereafter, the defendant was admitted to bail pending his appearance in the district court to answer to the charge. In the meantime he became a fugitive from justice, and his whereabouts were unknown until some time in December, 1920, when he was apprehended in Ft. Dodge, Iowa; so that the case actually came on for trial more than 8 years after the homicide occurred.

In the spring of 1913 defendant and Lum Moore were living in the same community; Moore having rented some land from the defendant. There was some misunderstanding about the way Moore was taking care of the land. A few days prior to the homicide the defendant made a statement to a banker at Kansas, Okla., who made some inquiry about Moore, to the effect that Moore had not treated the defendant fairly concerning the rental of some land, and that he ought to have taken his gun and gone over there and killed him.

It was shown by the testimony of another tenant that on the day preceding the homicide the defendant and Moore had a quarrel about their business affairs. Moore demanded payment from defendant for the loss of some cotton scales, and defendant claimed that Moore was indebted to him. In the course of the difficulty Moore drew his knife on the defendant, and the defendant retreated.

On Tuesday, the following day, defendant and Bert Pierce, the other tenant, were plowing in a field a portion of which had been rented to Moore. Moore and his son, Johnny, a boy 12 years old, left their home near by to work in this field. Moore was leading his horse with one hand and had a bucket of water in the other. After going some distance Johnny separated from his father to go to another part of the field for the purpose of cutting sprouts. Johnny testified that his father came up to where the defendant and Pierce were plowing; that his father stopped some distance away from defendant's plow; that he (Johnny) was too far away to hear any of the conversation, but that he saw the defendant step out from between his plow handles, remove the lines from around his waist and fire three shots in rapid succession at his father, inflicting two mortal wounds; ahd that his father expired at his home at about 6 o'clock that evening.

Soon after the shooting a number of witnesses gathered at the place where it had occurred, and these witnesses testified that Moore was lying about 20 or 30 feet from the plow and that a bucket was near his side; that his horse was standing near by. Pierce, who was plowing with the defendant, testified that Moore approached the defendant in a belligerent attitude, threatening to cut the defendant's throat, and stating that it looked as though they were bound to have trouble and that they might just as well have it now; that after Moore made this statement he thrust his hand into his jump-

er pocket and started toward the defendant; that the defendant drew his pistol and fired three shots in rapid succession.

The defendant testified in his own behalf, claiming self-defense, and stating that when Moore put his hand in his jumper pocket he believed that Moore was armed with a pistol and believed that it was necessary for him to shoot quickly for his own protection.

Witnesses who took charge of Moore after he was wounded and who removed and examined his clothing found an unopened black-handled pocket knife. There is no testimony indicating how large a knife it was. The wife of the deceased testified that she kept the knife for some time after the homicide, until it was lost or stolen.

The several assignments of error urged will be treated in the order in which they appear in the briefs.

Frank Partain, a character witness, a cousin of the deceased, testified that Lum Moore, the deceased, had the reputation of being a peaceable law-abiding citizen. The defendant sought to impeach this testimony in the manner following:

"Q. Did you ever hear about his cutting Jim McCoy's throat? A. Yes, sir. (The state objects to the question as being leading. The objection is sustained by the court, to which the defendant excepts.) A. He was separating two brothers.

"Q. Was you present? A. I was.

"Q. And he cut one of their throats? A. I didn't see the act exactly, but heard the shooting and seen them coming up the road and seen Jim shooting at him.

"Q. Jim who? A. Jim McCoy.

"Q. Do you remember of him having a fight over at Scott Welch's yard with a cattle man? A. No, sir; I never heard of it.

"Q. Did you hear of him and John Partain having a shooting scrape? A. Yes; heard something about it, but not the particulars."

The objection made, as quoted above, should have been overruled, but the witnesses answered the question despite the objections, and this answer, together with the explanation following, sufficiently apprised the jury that the witness knew that the deceased had been in at least two serious difficulties, thus qualifying witness' testimony in chief. It appears therefore that defendant succeeded in getting before the jury all the facts to the same effect as though no objections had been interposed.

It is next urged that the court erred in not permitting attorneys for the defendant to introduce parts of a certified transcript of the testimony taken at the preliminary trial, given by Mrs. Moore, widow of the deceased, for the purpose of showing discrepancies between the testimony given by her at the preliminary trial and her testimony at the trial on the merits, just given. Bearing in mind the fact that the preliminary trial had occurred more than 8 years prior to the trial in district court, and that the stenographer who took the testimony at the preliminary could not be produced to authenticate that testimony, it was agreed between counsel on both sides that the testimony taken at the preliminary might be used the same as if the stenographer were present to verify it. To show certain discrepancies, attorneys for the defendant read portions of Mrs. Moore's testimony from the transcript of the record of the preliminary trial, and then offered the portion so read in evidence. This was by the court refused, in the following language:

"The request was that they might use the transcript of the testimony as evidence before the jury, and the court holds that, inasmuch as they have read all this portion of the

transcript into the evidence in this case, it would not be proper to introduce portions of the transcript unless they introduce the whole transcript.''

We think it would have been proper to have permitted the introduction of this portion of the record, but, since the matters sought to be shown were read into evidence in the presence of the jury, the refusal to permit it to be introduced formally is harmless.

In this connection the court intimated that they might introduce the entire record if they so desired. The reasons for this suggestion do not appear, but if the defendant felt aggrieved because he was not permitted to introduce this part of the record he could have done it by introducing the whole record.

Another point urged relates to the failure of the court to secure the services of a stenographer to record the argument of counsel to the jury. It seems that the regular court stenographer was not present at the trial and that by agreement the parties procured the services of a stenographer who was regularly employed at a nearby abstract office, and that her employer refused to permit her to continue on to the end of the trial. In order to avoid delaying the trial until they could send away to another town to secure a stenographer, the county attorney suggested that any objections that might arise in the course of the argument to the jury be written out in long hand to permit the court to pass upon the same, whereupon the argument proceeded.

Special counsel for the state, G. W. Goad, in his opening argument to the jury, among other things, said, ''Gentlemen of the jury, Harve Johnson has been proved guilty of the crime of murder by his accessory,'' referring to witness Bert Pierce, who the record shows was arrested for the homicide

but the cause later dismissed as to him. We find little if any evidence in this record indicating that Pierce was an accesssory. The record does show, however, that he was a most willing witness for the defendant; that although he stood within a few feet of the defendant when the shots were fired he made no effort to prevent the homicide. The word "accessory" was not defined by the court. To refer to Pierce as an accessory was technically a misstatement of fact, not warranted by the evidence, but the fact that he had been charged jointly with the defendant in the beginning may be considered as some excuse for counsel's making that remark. The testimony of Pierce was clear-cut and unequivocal—of such a nature that the jury could not reasonably be misled by the remarks quoted.

The county attorney in his closing argument, referring to a witness who had testified for the defendant, said, "This old man, in trying to find out something favorable to the defendant, had discussed the case so much with his wife that he had come to imagine that what he wanted to be true was true." This was rather a far-fetched deduction from the testimony given, but was a deduction predicated upon some evidence, with which the jury might or might not agree.

It appears that during the course of the trial some of the jurors became impatient because, as it appeared to them, the proceedings were unnecessarily tedious; that before final submission of the cause, while the jury were eating dinner at a separate table in a hotel dining room, one of the jurors, in the hearing of the others in the dining room, said, "We might get through if Miller don't have to send to Kentucky for more evidence;" that another juror made the remark that it would not take long to decide the case after it was submitted—that he intended to take a stick of stove wood with him into the jury room, presumably to hasten agreement among

the jurors. This remark, we assume, was of a jocular nature and not intended to be considered seriously. It further appears that while the jurors were in charge of the bailiff, before final submission, two or three of them at different times left the others on the sidewalk long enough to step into a drug store and buy cigars. Further complaint is made that at one time, before the taking of testimony had been concluded, and during a recess of the court, one of the jurors had commenced to talk with a neighbor, when the county attorney admonished him not to do so, stating that it might result in a mistrial. Another irregularity complained of is that after the jury entered the jury room, preparing to begin deliberations, one of the jurors asked for the plat. The sheriff communicated this to the county attorney, who in turn spoke of it to one of the attorneys for the defendant. The sheriff then returned to the jury room and asked the jurors if they still wanted the plat, and they said they did not.

As we view it, none of the irregularities touching the conduct of the jury is of sufficient importance to warrant a setting aside of the verdict.

The court fully and fairly instructed the jury upon every degree of homicide; upon the law of self-defense; upon the law of which of the parties appeared to be the aggressor; upon the question of former threats, communicated and uncommunicated; upon the law of former difficulties between the parties; and as to the law touching upon character evidence.

From the undisputed facts showing that the defendant shot the deceased when the latter was 20 or 30 feet distant, and that the only hostile movement made by the deceased was to advance a step as he placed his hand in his pocket, with the declaration that he intended to use a knife, the

jury must have concluded that the defendant was not in such imminent danger as would induce a reasonable person to resort to the use of firearms, as shown by this record. The defendant was in company with a friend, who would doubtless have interfered to prevent a cutting affray, if indeed such an affray seemed imminent. These outstanding facts, together with the fact that after the preliminary trial the defendant became a fugitive from justice, all considered together, warranted the jury in rendering the verdict it did. To us it seems that the irregularities pointed out in this opinion are not vital nor prejudicial under the peculiar conditions shown.

The judgment of the trial court is affirmed.

MATSON, P. J., and DOYLE, J., concur.