Sam **TOWNLEY**, Plaintiff in Error,

v.

**STATE** of Oklahoma, Defendant in Error.

No. A-12665.

Court of Criminal Appeals of Oklahoma.

Sept. 30, 1959.

On Rehearing Sept. 14, 1960.

422

---

Miskovsky & Miscovsky, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., J. W. (Bill) Berry, County Atty., Oklahoma City, for defendant in error.

NIX, Judge.

The plaintiff in error, Sam Townley, who shall hereinafter be referred to as the defendant, was convicted in the District Court of Oklahoma County upon an information charging the defendant with the crime of assault with a dangerous weapon. He was tried before a jury who found the defendant guilty, but could not agree upon the punishment and left the same to be fixed by the trial judge, who sentenced defendant to the state penitentiary for a term of eighteen (18) months.

The defendant properly lodged his appeal in this court seeking reversal upon nine assignments of error, innumerated and stated as follows:

"1. The verdict is contrary to law and evidence adduced during the trial and the court committed error in overruling defendant's demurrer to the evidence.

"2. Several members of the jury were subjected, in the course of the trial, to influences of a prejudiced and biased person, to-wit: one Howard K. Berry, attorney at law, and counsel for prosecuting witness in the civil damage suit, who is also the brother of the prosecuting official.

"3. The court committed error in ruling upon evidence during the course of the trial.

"4. The county attorney made improper, inflammatory, and grossly prejudicial remarks during the course of oral argument.

"5. The proceedings were interrupted by improper, prejudicial, inflammatory, and biased exclamations of a spectator.

"6. The court committed error in denying defendant's Motion and Affidavit for Continuance, forcing him to trial in the absence of a material eye-witness.

"7. During the progress of the trial, and on at least one occasion, prisoners clad in jail garb were paraded in the court room under heavy escort of armed guards in the presence and in plain view of the jury.

"8. The court failed to admonish the jurors not to read the newspaper accounts of the proceedings. That, in the course of the trial, and upon submission of this cause, several of the jurors read imperfect, inaccurate, and incorrect newspaper reports of the trial, appealing to the passion and prejudice of readers, and containing adverse comments on the probable guilt of the accused; said jurors were improperly and erroneously permitted to bring said newspapers into the jury room during their deliberation upon the verdict.

"9. Defendant was deprived of the right to have the trial court consider and determine his application for suspended sentence in the exercise of sound, lawful, and legal discretion, unimpaired by and free from injection of considerations not sanctioned by law, and that said deprivation constituted denial of due process and equal protections of the laws under the State and Federal constitutions."

Though some of the contentions of error are without merit and do not justify discussion herein, there are some assertions that have given the court much concern. Before engaging discussion as to these advancements, it will require a brief recital of the facts from which the case arose. Counsel for defendant is to be commended upon the presentation of a good brief and therein contained is an accurate summary of the testimony. The state has not filed a brief in this case, thus the summary is not questioned. It adheres closely to the transcript of the testimony and is worthy of recital:

"In its evidence in chief, the state produced the following witnesses: Bill Billingsley, the victim of the alleged assault; Geneva Montgomery Billingsley, the then girl friend of said victim, and later his wife; and Sherman Brown, a deputy sheriff of Oklahoma county.

Bill Billingsley testified, in substance, on direct examination, as follows:

A slight disagreement developed between him and his girl friend on the night of this alleged crime; while having this discord, Billingsley drove east on Reno Street, in Oklahoma City, turning right into South Eckroat, and then drove about twenty yards south to a point where he parked his car. Approximately fifteen minutes later, an automobile came from the west, heading east, "got right behind us," then slowed down to about four or five miles an hour. When the other car was positioned directly parallel to that of Billingsley, a firecracker, or cherry bomb, was thrown out of it, which exploded, making "a bit of noise."

Billingsley further testified that he continued at the same position for another ten minutes, when he saw lights of a car coming from behind and from the same direction as before. It looked like the same car that had passed him previously. Seeing this car, Billingsley turned the ignition switch and then did start his automobile. The other car came by at a slow speed and another firecracker or cherry bomb was thrown therefrom. The witness (Billingsley), set his automobile in motion, in pursuit of the other car, overtook it, and then positioned his automobile directly in front of the other to block and prevent its forward passage. Putting his gear in reverse, witness alighted from his car, and walked back to the other automobile, to the driver's side thereof:

"And I walked back to the car and I opened the door and as I opened it, I got about a few words, 'what are you doing', or 'what are you doing that for', something like that, just a few words, when I saw the fellow in the front seat sort of swing towards me just a little bit and his body kinder twisted towards the door with a gun in his hand. Had it down about his mid-section and just about then the gun was discharged and it struck me in the abdomen, and I called back to Geneva and told her that I had been shot, and then I tried to walk back to the car and I fell on my knees and from then on I was pretty hazy—I don't know much about what happened—I didn't know what went on.
* * *

"Q. (By county attorney) What is the next independent recollection you have while you were on the ground? A. (By Billingsley) Well—Geneva and Sam Townley had me up to this house and were trying to get me in the door and a fellow came to the door—I believe his name was Turley—and they got me in the house, and I am not sure, but I believe they put me on the divan and geneva tried to call in but, for some reason, she couldn't get ahold of the ambulance and she said then she

would just take me in my car and I believe that then she and Sam Townley both helped me out of the house and she got me on the car and I was in the back seat and she took me on to Mercy Hospital in my car."

In his further testimony Billingsley related that he did not know the defendant at the time of the incident, but recognized him now as being the defendant, Sam Townley.

On cross-examination the same witness (Billingsley) testified in substance, as follows:

He did not see any firecracker and did not know where it was thrown; all he knew about it is that he heard the explosion sound. Neither he nor his girl friend were hit by the firecracker. He further stated that at the time of the incident he was dressed in a pair of slacks and without any upper apparel, and that the lights of his parked automobile were not on. First, the witness explained he turned the engine on the second time he saw the other car "to get out of there" if there was going to be some trouble, but on further cross-examination could not explain if and when he changed his mind "about getting out of there." After setting his automobile in motion, witness admitted he "got in front of him (Townley) so he could not get around", but there wasn't anything to keep him (Billingsley) from moving forward or leaving the scene. Although witness recognized the occupant of the other car as Ed Blancett and thought the whole incident was a practical joke, he came over to the defendant's side of the automobile (the driver's side), opened the door, and proceeded to advance toward the driver, "starting to stick his head in." He was not, nor did he feel himself in danger, until he opened the door and advanced toward the defendant. Billingsley stoutly denied "jerking" the door open and trying to drag the defendant out of the car:

"Q. But there wouldn't have been any reason at all, at that time, why you could not have gone on and had no trouble? A. No, sir."

Sherman Brown, a deputy sheriff of Oklahoma county, testified as follows:

He made an investigation of the incident. Pursuant to the call, he went to the Mercy Hospital, and talked to Sam Townley about the facts of the incident: Sam Townley told him:

"And, he (Sam Townley) and this here Ed Blancett were going home, going down South of the Townley Dairy—and they drove down there—that there had been some parking down there and they thought they would have some fun; and, so, they drove down the road and throw*ed* a firecracker over this car; and turned around and come back and throw*ed* another firecracker over this car; and that at this time this boy started chasing them and hemmed them up; and when he hemmed them up down there he got out and come back to the car where Sam*uel* was at, and opened the car door and said, 'What the hell's going on here?'; and Sam*uel* said, 'I told him to stand back, stand back, I've got a gun.' and, he said,—'about that time the gun went off. I don't remember pulling the trigger.' "

On cross-examination, by counsel for defendant, Sherman Brown admitted that defendant told him he did not intend to shoot the victim, and that he did not remember pulling the trigger. The deputy sheriff was satisfied with and certain of the statement Sam Townley gave him, as being "the truth"; defendant told the deputy he threw the firecracker over the car, and not at the car. A report was made in the sheriff's office, which Sherman Brown identified, and after considerable questioning, admitted that the report "is as accurate as you could get it."

The report contains this statement of the incident:

"* * * and in the *scuffle* which followed, Billingsley was shot with a Beretta caliber 6.3, * * *"

The testimony of Geneva Montgomery, now Billingsley, was substantially as follows:

The car parked by Billingsley was headed north, the other car, defendant's car, came from the south going north; the firecracker landed by the door; she didn't know what went on after Billingsley alighted from the car in which she was a passenger until she heard Billingsley shout, "Geneva, this guy shot me." Geneva corroborated the testimony previously given by Bill Billingsley to the effect that neither the car nor Bill and Geneva were hurt by the firecrackers; that Bill Billingsley blocked Sam Townley's passage, preventing him from being able to go forward. Sam helped the victim to the nearest house (Turley home) where they laid Billingsley on the divan. (Defense testimony)

Richard Starkey was at the home of his sister, Mrs. Ray Hawthorne, on the night of the incident and the following morning; he was awakened by the screeching of brakes or tires. The witness was asleep in the kitchen next to the door on the east side of the house. The door was open, there was only a screen door. Upon awakening, Richard looked out through the screen door, saw two cars, one of which "had the other car pulled off the road;" a man jumped out of the front car, slammed the door, ran back to the second car, or the car behind, pulled the door open and started to pull the man out of the second car. While on his way to the second car, Starkey heard the man scream: "Get out of that car you G. D. S. O. B.". After there was a scuffle between the two men, he heard a shot; next, witness saw one man helping the other towards the Turley home. The first time Starkey saw a girl was when the two men were proceeding to the Turley house. The girl was beating one man in the back with both fists. He heard the two men scuffling on the gravel.

Nan Turley states she lives at 603 Eckroat; on the night of the incident, she was awakened by a loud muffler noise; she looked out the window; saw a car parked in front of her house; she heard a noise which she thought was a firecracker explosion; there was a lot of "hollering and cursing going on" while the two men were approaching her house; then the defendant and the victim, accompanied by Geneva Montgomery, now Billingsley, came into the house—Sam was holding the victim's arms. Sam Townley was helpful and offered aid to the victim.

Mrs. Sue McGowan testified she heard a car screech to a halt and then a loud commotion going on; then she heard a shot, but couldn't understand any of the conversation that preceded it. Following the sound of a shot, she heard someone saying: "You shot me." Then a woman's voice was heard by witness several times, saying: "Come back here you S. O. B." Thereafter, Mrs. McGowan saw three figures going towards the Turley house.

Mrs. Ray Hawthorne, the sister of Richard Starkey, testified she was living in the third house from the south next to the scene of the incident on the night of the 13th of July, 1956; she heard some brakes screeching. About five minutes afterwards, she saw a man get out of the front car, and she heard a shot. Following the shot, she heard a man say: "You shot me, you S. O. B."

Robert Turley was at his home on the night of the incident. His attention was attracted by the racing of car motors. He got up and looked out of the window, and next heard the screeching of brakes. He heard a lot of profanity and loud noises, and then a sound, which he thought was a firecracker explosion. After getting up, he saw three figures coming toward his house. Sam Townley, and Geneva Montgomery, now Billingsley, brought the victim into his home.

Bob McGowan was at his home on the morning of the incident. He was awakened by a "kind of explosion." When he got up, he saw two figures start towards Turley's home. Afterwards, witness proceeded to the Turley home, where he saw Billingsley seated on a divan; Geneva Montgomery was making a telephone call while Bob Turley and Sam Townley were examining Billingsley. Sam and Geneva helped the victim from Turley's home back

to Billingsley's car; Sam Townley wanted to drive the victim to the hospital, but Geneva would not let him do it.

The statement of Ed Blancett was read to the jury. Therein it was set forth:

Blancett was a passenger in Sam Townley's automobile. At 1:30 a. m. July 14, 1956, he and Sam Townley passed a parked automobile that was apparently unoccupied. The first time they passed the automobile, they were going in the direction opposite to that in which the other car was headed. After defendant passed the other automobile, the defendant threw a firecracker, and did not see anybody in the car. Defendant and Ed Blancett drove back and again saw the car still parked at the same place. They could see no one in the car as they approached. This time defendant was going in the same direction as the parked car was headed. Another firecracker was thrown by Townley, and exploded eight to ten feet away from the parked automobile. Thereafter, the parked car's lights were suddenly turned on. The parked automobile proceeded in pursuit of the Townley car. Billingsley overtook the Townley car, sped ahead, stopping in the middle of the road directly in front of the Townley car, preventing its forward passage. Billingsley jumped out of his car, rushed back to defendant's car, cursing in a loud voice. On approaching Townley's automobile, Billingsley jerked· open the door on Townley's side of the car. Townley told Billingsley to stand back and leave him alone. Billingsley grabbed Townley and began dragging him out of the car. The two men scuffled and while so scuffling, the gun discharged, wounding Billingsley. Townley attempted to render assistance and aid to Billingsley. Blancett was the only person present, other than Townley and Billingsley during the shooting incident.

Sam A. Townley, the defendant, testified that he was 20 years of age on July 14, 1956, when the incident occurred. On the night of the incident he drove with Ed Blancett east on Reno street in Oklahoma City, and then straight south into South Eckroat. While so driving in a southerly direction, defendant observed a car parked approximately by 603 South Eckroat. The parked automobile was about eighty feet north of the corner of Southeast Eighth Street. There were no lights on the parked car. As defendant drove by, he looked in the car and did not see anyone therein. While passing the same, he threw a cherry bomb or firecracker back of the car, which he had kept in the glove compartment since the preceding 4th of July. In the glove compartment defendant also had a Beretta pistol, the same having been placed there after a target practice during the month of May before the incident.

After passing the Billingsley car, defendant drove on up Grand Boulevard to Southeast Fourth Street. He asked Blancett to look back and see if the lights of the parked automobile. were on; not seeing anything, Blancett suggested that they go back there to see if there was anyone in the automobile. Another firecracker was handed to defendant by Ed Blancett, which Townley threw out by the parked automobile. At that moment, defendant suddenly heard the engine of the parked automobile roaring and the headlights flashed on. The other car sped in pursuit, overtook the defendant's automobile, then swerved sharply to the right, directly in front of the defendant, blocking his forward passage, and causing him to stop, just slightly north of the front of the Turley house. A man alighted from the automobile, whom defendant later learned to be Billingsley. Yelling, "Get out of the car, you G. D. S. O. B.", Billingsley slammed the door of his automobile, preceding toward the defendant. Defendant shouted, "Stand back, stand back, I have got a gun." As Billingsley approached the Townley car, he grabbed the front door on the driver's side, jerked the same open, yelled, "Come on out", and attempted to pull the defendant around and out of the car. Trying to brace himself and pull away from the assailant, Sam Townley was holding the gun in his left hand and behind his back; he was trying to drop in behind the seat before he was

dragged out of the car. Ere he could free himself from Billingsley, he was spun or pulled around, and the gun discharged.

After the gun incident, Geneva Montgomery and defendant helped the victim toward the Turley house. Geneva was hysterical, pounding her fists on the back of the defendant.

Jack Rose, another deputy sheriff, testified for the state on rebuttal. The defendant told him he did not intend to shoot Billingsley; didn't know when he shot him; the gun "went off."

Officer E. W. McCumber testified on rebuttal the defendant told him as follows:

"There had been people hanging around my grandfather's property that I didn't think should be there."

Upon this set of facts arose the case at bar. The summary related herein does not portray the acts of criminals, but reveals a tragedy created by the impetuous, reckless, and distorted judgment of thrill seeking young people in utter disregard of reason and good counsel. It has been said that every period of life has its peculiar temptations and dangers, but youth is the time when we are most likely to be ensnared. Soul sickening indeed is the sad spectacle of youth idling away the springtime of his existence, and not only losing the benefit of time, but wasting in the formation of evil habits those hours in which he might clothe himself with the provisions for a stable future and happy life. The province of this court is not dissipated in determining the elements of blame and in what proportion it should be shared; that was a question for the jury who shouldered the responsibility and decided that in favor of the prosecuting witness. The defendant here committed a cowardly, dangerous, and stupid act in engaging in the present day deplorable pasttime of throwing fire crackers at occupants of other cars. Such act carries with it the potential loss of sight, hearing, or permanent disfigurement. No justification can be offered in defense of such action, nor can it be explained within bounds of reason.

It is inexcusable and completely void of understanding. On the other hand it does not afford to the recipient any provocation for him to take the law into his own hands and become the aggressor for the purpose of revenge. It should in every instance be a matter for the police. Whether or not the prosecuting witness invoked his wound by taking the law into his own hands or whether he became the aggressor, and whether the defendant had a right to later defend the attack of the recipient of the firecracker episode, likewise, was a question for the jury which was decided against the defendant. It was wrong, inexcusable, and merits the greatest condemnation to have thrown the firecracker. Likewise, it was wrong for the recipient to take the law into his own hands and pursue the defendant, block his path of escape and attempt to pull him from the car and this is in no manner condoned. It would have been much better judgment to have taken down his license number, reported it to the police and let the law pursue its course. The jury no doubt thought these matters were of great concern as they were unable to agree upon any degree of punishment.

We have thoroughly considered each of defendant's contentions of error and though some of these assertions constitute close questions of law, we have failed to find sufficient error in the record to require reversal.

The first assignment states that the verdict is contrary to law and that the court committed error in overruling defendant's demurrer to the evidence. With this we do not agree. True, there is a conflict in the testimony as to certain elements of the crime. However, there is substantial evidence if believed by the jury to justify their verdict as to the guilt of the defendant. It is uncontradicted that defendant had in his possession a pistol; that he fired the shot that wounded the victim. The justification of his action in so doing and the degree of provocation was determined by the jury. Nevertheless, there was evidence of the material elements of the crime upon which the jury could find their verdict.

This court has often held as was stated in the case of Coats v. State, 90 Okl.Cr. 217, 212 P.2d 141, 142, 214 P.2d 455:

> "Where the evidence is conflicting, the weight of the evidence and the credibility of the witness is for the jury, and the Criminal Court of Appeals will not substitute its judgment for that of the jury where there is evidence reasonably tending to support the conclusion arrived at by the jury."

The testimony afforded ample cause to justify the court in overruling the demurrer and submitting said cause to a jury.

■ Proposition number two presented by the defendant is of great concern to the court. It is of a serious nature and requires earnest discussion. It is contended by the defendant that at the conclusion of the evidence the court called a thirty minute recess at which time witness William G. Paul saw an attorney who represented the prosecuting witness in a civil action arising out of the shooting, talking with two of the jurors, W. C. Hasty and J. K. Monroe. Mr. Paul testified that after this came into his view, the jurors then split up, and discontinued their conversation. It is well to here state that the prosecuting witness brought suit against the defendant for damages resulting from wounds inflicted by the defendant, in the amount of $125,000. The attorney seen talking to these two jurors was the attorney of record for the plaintiff in that action. Witness Paul did not hear any of the conversation but was very positive in his statement as to seeing the attorney and jurors engaged in conversation. His exact statement was as follows:

> "By Mr. William G. Paul: Approximately ten or fifteen minutes after the Court recessed for a 30 minute period I was walking down the corridor immediately outside of the door to Judge Wallace's courtroom and, as I turned the corner to approach the elevator, I observed Howard K. Berry engaged in conversation with two of the male jurors, sitting in the case now on trial, whose names are William C. Hasty and J. K. Monroe."

> "I do not know how long they had been engaged in conversation only they were talking when I first observed them. I do not know what they were saying and I did not hear a word. After about 3 or 4 seconds the two jurors left together to get in the elevator and Mr. Berry walked down the hall. He remained on the 5th floor.

> "Mr. Howard K. Berry is attorney for William Billingsley—Bill Billingsley—the prosecuting witness, in a controversy with Townley in a civil action for damages Montgomerys and Billingsleys against the Townley Dairy and Sam A. Townley.

> "By Mr. Crowe: Comes now the defendant, at the close of the testimony, before the case is submitted to the jury, and moved the court to discharge the jury and declare a mistrial in this cause and grant the defendant a new trial."

> "By the Court: It will be overruled. Exception allowed."

The record is completely void of any denial that such conversation took place. It is void of denial in that the attorney who engaged in such conversation was an attorney for the prosecuting witness who had instituted a civil suit against the defendant for damages arising out of the incident which is the substance of the case at bar. It is further contended that the attorney was a prominent and well known attorney and brother to the county attorney who prosecuted this action. He could have been easily produced as a witness. The trial judge in overruling the motion for a mistrial no doubt relied upon the decisions of this court stating the rule as adopted in the case of Cox v. State, Okl.Cr., 283 P.2d 545, 557:

> "Before the final submission of a case the legal presumption is that the jurors performed their duty in accordance with the oath they have taken, and that presumption is not overcome by proof of the mere fact that during an

adjournment of the trial the jurors were permitted to separate. The defendant must affirmatively show that by reason thereof he was denied a fair and impartial trial, or that his substantial rights were prejudiced."

It is to be noted that the same case makes a distinction as to the burden of proof before and after final submission. It is conceded by abundant authority and numerous decisions that after final submission that separation of the jury or any action subjecting them to outside influence is presumed to prejudice the defendant and the burden is upon the state to prove otherwise. Before final submission the courts are clear upon the matter of separation; that the burden of proof is upon the defendant to show prejudice or denial of a fair trial. In the instant case the charge was made by witness Paul and neither the state nor defendant assumed the burden of proof. Neither the two jurors nor the attorney were called by either side to testify as to what was actually said or what transpired during the conversation. Apparently no effort was made. The trial judge was without help from state or defendant on determining the issue. This court said in the case of Smith v. State, 19 Okl.Cr. 14, 197 P. 514:

"While this court does not approve of a juror, while serving as such, having conversation by phone with outside persons, and with janitors or other persons, than the jurors, being in the jury room with the jury without authority of the court and consent of the defendant, to entitle the defendant to a new trial on account thereof, it must be made to appear that an injustice was done the defendant by such conversations * * *."

See also Proctor v. State, 22 Okl.Cr. 445, 211 P. 1057; Johnson v. State, 26 Okl.Cr. 339, 223 P. 890. The proper rule seems to be well stated in 39 Am.Jur. 114, § 100:

"Even in criminal cases a new trial ordinarily will not be granted if there is nothing to show that the communi-

cation between the jury and the witness was improper or that the party complaining was prejudiced thereby."

It appears from a review of this issue that the trial judge acted within the scope of his discretion in the absence of any effort to show that defendant was prejudiced thereby. The incident at the most appears suspicious but is not of sufficient consequence to constitute misconduct of a prima facie nature.

■ This court does not intend to approve or condone such an occurrence even though it may have been of little consequence and purely coincidental. Your writer agrees that it is of the utmost importance that triers who pass upon the lives and liberties of men should so act that no possible suspicion can attach to them of having been in a position where improper influence, prejudicial to the accused or in his favor, may have operated on their minds.

■ It is to be noted in the transcript that there is recorded a stipulation by the attorney that the jury would not be kept together during the trial and would be permitted to separate during recess and other times when sent from the court room. In such matters the court is given broad discretion and since the incident was not misconduct of a prima facie nature and in the absence of any indication that the defendant was prejudiced thereby, we are prone to sustain the trial court in its ruling. It cannot be fairly said that the incident, in absence of any showing to the contrary, triumphed over the obligations assumed by the jurors on entering the jury box to listen to and fairly weigh the whole evidence.

■ Defendant next complains that the court committed error in ruling upon evidence during the course of the trial. It appears from the record that Geneva Montgomery, a witness for the state, testified that Sam Townley, the defendant, kept her from calling the police immediately, of the shooting, while at the Turley home. On direct examination of Mrs. Turley, counsel for the defendant, in an attempt to im-

peach Geneva Montgomery, now Billingsley, asked the following question:

"Q. Now right there—Mrs. Turley —she said—I want to ask you if, at any time that night, Sam said, "Don't call the police."

The question was objected to by the state and sustained by the court. This contention of error is not well founded as the court upon sustaining the objection also admonished the witness and counsel to "just state the conversation." Counsel did not rephrase his question but the evidence desired was adequately produced by additional cross-examination. The question was leading and suggestive and the court was correct in his ruling and counsel for defense obtained the desired results by further examination of the witness. This did not constitute an exclusion of evidence but merely an attempt by the trial judge to require counsel to properly state his question in line with the rules of evidence.

 Defendant urges as his assignment of error number four that while the county attorney was examining state witness Geneva Montgomery, who had just testified that she moved to Oklahoma City in 1950 and had been familiar with the Eckroat Road between 1950–53, that her mother who was a spectator, arose from her seat and motioned her handkerchief and asked "if she might see Mr. Berry" and stated that they didn't move to Oklahoma City until 1953.

The court called a recess at the request of the defendant and admonished the spectator not to pursue such course of conduct. Counsel moved for a mistrial upon these grounds and the motion was properly overruled. We cannot earnestly attach any significance to this assertion of error as the interruption does not reflect any degree of damage to the defendant's rights; as a matter of fact, it was in his favor as the mother's outburst impeached her daughter who was then testifying for the state.

 Where such incidents occur and where it appears spontaneous and outside control of the court it must be apparent

that such remarks were prejudicial to the right of the defendant to require reversal. Such is not the case here.

Defendant complains error was committed by the court denying defendant's motion and affidavit for continuance, forcing him to trial in the absence of a material witness. The testimony reveals that Edward A. Blancett was an eye witness to the altercation and a very material witness for the defendant, and at the time of trial was serving his country in the U. S. Army in South Korea. A close review of the record shows that an application for continuance was filed by the defendant on November 6, 1956, based upon the grounds that the material witness was absent by reason of army service. Said continuance was granted by the trial court and said case stricken from the docket and reset on the January docket, 1957. Another motion for continuance was filed on January 31, 1957 by one of the attorneys of record, Mr. Robert L. Bailey, who was, at the time, rendering service as a state legislator and for the reason, the case was continued until 30 days after adjournment of the legislature.

 On October 29, 1957 an additional motion for continuance was filed upon the grounds that said witness was still in the armed service and was not available to testify. Attached to said motion was a statement as to what said witness could expect to say if he were present. Said continuance was granted and the case stricken from the trial docket with instructions that defense counsel begin an immediate inquiry of the Adjutant General of the United States to ascertain when said witness could be available. The defense was given 45 days to obtain the information and make it available to the county attorney's office. Defendant filed another application for continuance on the 14th day of February. However, said application shows to have been subscribed to on the date of trial February 17, 1958. The record is silent as to any action taken in said application. However, in the statement of the progress of the proceeding after the conviction, the

records reflect that said application was overruled on the 17th day of February, the date of trial. The record does not reflect that a hearing was had. No testimony was taken nor report made as was ordered by the trial judge when the last continuance was granted. The record does not show that the application was urged other than by the affidavit for continuance subscribed to on the day of trial. It was stipulated between the attorneys for the defense and the state that the statement of the absent witness' testimony could be introduced in evidence. This court has consistently held that the granting of a continuance is within the sound discretion of the trial court and unless there is an abuse of that discretion, his ruling will not be disturbed by this court. We fail to see where the court abused its discretion in the instant case by denying the fourth application for continuance.

Defendant next contends that during the progress of the trial one of the assistant county attorneys proceeded in open court and in the presence of the Townley jury while they were sitting in the box, to bring prisoners before the court attired in prison clothes. That Mr. Theus, the assistant county attorney, presented them to the trial judge, who received their pleas of guilty and passed sentence upon them. The only witness presented to support this contention was Mr. Theus, who testified he brought several prisoners before the court to enter their guilty pleas and receive their sentences. However, he did not remember whether or not the jury was in the box at the time. If said incident happened in the presence of the jury there was no objection made and as far as the record is concerned, there is no proof that this actually took place in the presence of the jury. Therefore, the proof is not sufficient to bring this question squarely before the court. It is well, however, to advise the trial courts that the practice of interrupting trials for the purpose of accepting pleas from other defendants should be abandoned. It should never be done in the presence of a jury engaged in the trial of a criminal case. A defendant is entitled to his day in court free from outside influence or impressions —psychological or otherwise, that may tend to distract from the case at hand. Accepting guilty pleas and rendering sentences thereon before a jury selected to try another law suit, may tend to fix in their minds degrees of punishment by the power of suggestion. It may create sympathy for those without attorneys to the detriment of a defendant represented by able counsel. It may destroy the presumption of innocence to which the defendant is entitled and portray a court room as a place for those accused of crime to receive sentence, instead of a temple of justice to determine guilt or innocence by a fair and impartial trial before a just and unbiased jury. If a court docket is so congested that pleas must be received and sentences awarded during the progress of a trial, a recess should be taken and the jury removed from the court room during such proceedings so that sending a defendant to prison will never appear mill run routine or customary to a trier of the liberties of man.

The next contention on the part of the defendant complains about failure of the trial court to admonish the jury not to read the newspaper accounts of the proceedings. That in the course of the trial, several of the jurors read imperfect and incorrect newspaper reports of the trial. We are prone to disregard this assertion of error in view of the fact that the trial judge in the course of the trial admonished the jury six times as to their obligation as jurors not to discuss the case with any person or form any opinion as to guilt or innocence. Counsel, at no time, objected or offered suggestions as to additional admonitions. The first time the question was raised was on the motion for a new trial. If defendant was not satisfied with the admonition given by the court he should have called it to the court's attention, especially in view of the liberal stipulations entered into at the outset of the trial; said stipulation appearing as follows:

"Let the record show that it is stipulated by counsel for the state and de-

fendant, in open court, that the jury may not be kept together during the trial of this cause, but that they may be allowed to separate during recesses, or when sent from the court room during discussion as to legal questions, or otherwise, under proper admonition of the court."

The counsel for defense had ample opportunity to suggest such admonition had they desired so to do. We agree that the best policy is to keep from the jury any newspaper containing an account of the trial. Yet defense counsel should not remain silent while laying behind the log on a technicality upon which they attempt to rely for reversal.

The last contention of the defendant is that he was deprived the right to have the trial court consider and determine his application for suspended sentence in the exercise of sound, lawful, and legal discretion, and that said denial constituted a denial of due process and equal protection of the laws under the state and federal constitution. The record in this regard reflects that a very lengthy hearing was had before the trial court upon a motion for a new trial. After said motion was overruled counsel for the defense offered evidence in mitigation of sentence and punishment. The defendant testified that he was a senior at the University of Oklahoma in furtherance of his education. That he had never been convicted of any felony or misdemeanor involving moral turpitude. That he lived with his mother and father except during school months at which time he lived in a campus dormitory for upper classmen. That he was 20 years old at the time of the altercation.

Approximately 100 letters were presented to the trial judge in behalf of defendant for a suspended sentence. The letters were from many well known and prominent people. They included letters from school teachers who had taught the defendant both in elementary and college as well as preachers, merchants, doctors of medicine, dentists, contractors, Dean of the University,

housewife, laymen and lawyers. Seven members of the jury wrote the trial judge recommending a suspended sentence. The victim of the altercation wrote a lengthy letter recommending a suspended sentence advising the court that he had been compensated for his damage by settlement of the civil law suit filed by him against Townley. The lawyer representing the prosecuting witness recommended to the trial judge that a suspended sentence be given in view of the circumstances surrounding the offense and that the $125,000 civil suit had been satisfactorily settled.

The attorneys are to be commended in compiling an abundance of evidence, letters and recommendations in their proof that the defendant was eligible for a suspended sentence. The evidence on the part of the defendant is conclusive and stands uncontradicted that young Townley was of previous good character and had no previous conviction. Though defense counsel presented an abundance of testimony in support of their plea for a suspended sentence, the county attorney offered no proof in refutation thereof except his oral argument against probation with the prime assertion that neither he nor his force had ever recommended a suspended sentence in a case involving the shooting of one by another. There can be no doubt that the trial court had before him sufficient facts to grant a suspended sentence had he so desired until Title 22 O.S.A. § 991:

"Whenever any person shall be convicted in any court of record for any crime other than murder, manslaughter or arson, the Judge trying said cause may, after sentence, suspend said judgment and sentence and allow said person so convicted to be released upon his own recognizance * * * provided, that no such person shall be so released, who, has not, prior thereto, borne a good reputation, or who may have been prior thereto, convicted of a felony in any state or territory."

However, the learned trial judge was acting within his province in not granting the

suspended sentence. This court has held in numerous cases that the granting of a suspended sentence is discretionary with the trial court, and the Court of Criminal Appeals will not interfere with exercises of that discretion. See Neeley v. State, Okl.Cr., 277 P.2d 217; Voegel v. State, Okl.Cr., 277 P.2d 215; Leasure v. State, Okl.Cr., 275 P.2d 344; Shannon v. State, 97 Okl.Cr. 18, 256 P.2d 475.

This court has further held in the case of Ex parte Swain, 88 Okl.Cr. 235, 202 P.2d 223, 227, that:

"Only those persons coming within terms of [this section (991–992) OSA Title 22,] are eligible for suspended sentence, but they have no right to demand it: and it may not be granted then except at discretion of court."

Also see Stone v. State, 86 Okl.Cr. 1, 188 P.2d 875; State v. Humphrey, 85 Okl.Cr. 153, 186 P.2d 664. In a 1955 case, Abbitt v. State, Okl.Cr., 282 P.2d 246, 247, the court said:

"The matter of suspending or not suspending a sentence rests entirely within the discretion of the trial court."

The final argument and contention of the defendant is that the trial judges of Oklahoma County have adopted a policy that only those defendants who enter a plea of guilty are eligible for a suspended sentence and in support thereof submit a certified copy of the court docket from January 1, 1954 to December 24, 1958 listing all cases where the defendant was granted a suspended sentence; said docket reflects that suspended sentences were given in approximately 700 cases; only two of these were given where the case was tried by jury. The defendant also filed a motion in this court on March 28, 1958, to diminute the record by incorporating a newspaper article appearing in the "Oklahoma City Times" on March 19, 1959, wherein Judge Mills was quoted as saying to a jury in the case of State v. Rudy Quintero, who was charged with assault with a dangerous weapon, the following:

"Judge Mills told the jury a suspended sentence will be given 'serious consideration' if Quintero has no previous record and is otherwise eligible. However, the court commented that the six district judges here do not look with favor on giving suspended sentences after jury convictions * * *."

Of course, this is a newspaper report published more than a year after the trial of the defendant and no evidence was presented as to its truth or veracity; its accuracy or inaccuracy. It is to be noted that the comment as reported stated that "serious consideration" would be given to a suspended sentence, though the courts did not look with favor upon such a sentence where defendant was tried by jury. The court docket submitted by defendant indicates that the trial judges in Oklahoma County have been most conservative in giving suspended sentences to those who were convicted by jury. However, this court is in no position to pass upon this action in previous cases as the facts as to defendant's previous good reputation in those cases are not known to this court and the trial judges were in position to know and pass upon that matter in each and every case. It would be indeed presumption for this court to say they were in abuse of their discretion in any case where we do not possess knowledge of the facts. Under the suspended sentence law of this state a defendant is entitled to have his request for a suspended sentence thoroughly considered irrespective of whether he entered a plea of guilty or was convicted by a jury. It was never meant to be used as a weapon to induce a guilty plea. The rule is well stated in the case of State v. Mitchell, 77 Idaho 115, 289 P.2d 315, 317. The Supreme Court of Idaho stated:

"Appellant was entitled to have the court consider all these facts in exercising its discretion in the determination of whether the application of appellant for probation should be granted. It was error for the trial judge not to consider the same, and to base his re-

fusal of appellant's application for probation solely upon the action of the jury. * * * The trial court must exercise this judicial discretion in a lawful and legal manner. He must give consideration to the application and grant or deny the same in the exercise of a sound, legal discretion. The refusal of the application must not be arbitrary and cannot be based upon mere whim or caprice nor upon any ground not sanctioned by the law."

The suspended sentence statute of this state was designed for the specific purpose of placing in the hands of the trial judges the method by which they could grant probation to these first offenders whose previous record indicated rehabilitation could be best made under supervision outside prison walls. Its purpose and the basis for its justifiable existence is well stated in the case of People v. Lippner, Cal.App., 16 P.2d 1020, 1022:

"It may be said with the utmost assurance that by precedent and by practice the basic reason for every probation is mercy to the defendant and the probability of rehabilitation of an individual to good standing in society. It should be granted only after mature consideration and after a conclusion by the court that the guilty one will not again forfeit his right to freedom but will in the end be salvaged from the wreck that crime has brought upon him. 'It (probation) is the last remedy suggested by humanitarians, sociologists, penologists and criminologists, and disinterested people generally, in an effort to make salvage of at least a fair percentage of those convicted of crime.' "

Probation under strict supervision is a well established element of our jurisprudence and must never be treated arbitrarily or with caprice. However, the right to determine the eligibility is vested exclusively in the hands of the trial judge. There is no hard or fast rules laid down as to the type of offender who should be granted a suspended sentence. The law was not designed for hardened or habitual criminals, but applies particularly to youthful and first offenders; offenders whose release on probation will not endanger the public, and those whom it is reasonable to believe will make serious effort to overcome abnormalities and defects and show promise of rehabilitation. In the instant case the trial judge was the sole person to make this determination and he did not see fit to grant the suspension. Not knowing upon what information his decision was based, or how he reached his conclusion, we are in no position to say he abused his discretion.

There are numerous irregularities in the case at bar which create close questions of law, bordering on reversal. There are numerous circumstances that have caused this court much concern. The fact that an attorney with a civil interest in the outcome of the trial was seen talking with members of the jury may cause the defendant to always ponder upon the effect of such conversation. Though the proof was not sufficient to cause reversal it is an incident that creates in the mildest sense, a suspicion; the fact that the jury was unable to arrive at a verdict as to the punishment; the fact that defendant's previous record was unblemished; the fact that seven members of the jury recommended a suspended sentence; that the prosecutor witness, his wife, and his attorney recommended a suspended sentence after stating he had settled their civil suit for a satisfactory sum; the fact that more than one hundred substantial citizens recommended probation.

Along with the close question of law as to whether or not the victim encouraged the shooting by taking the law into his own hands and become the aggressor, and whether defendant had proper provocation to protect himself by firing the shot, the fact that no brief was filed on the part of the state, this and other circumstances lead this court to believe that the ends of justice would be best served if the judgment and sentence of the trial court was modi-

fied so that defendant be sentenced to serve six months (6) in the county jail and otherwise affirmed and it is so ordered.

POWELL, P. J., and BRETT, J., concur.

## On Rehearing

BRETT, Justice.

This case has caused us great concern. It has been extensively briefed by the defendant, but neither on the original hearing nor on this rehearing have we had a brief on behalf of the state. If the matter herein on petition for rehearing had been presented in the defendant's brief in the original hearing, the state's failure to respond would have been considered as a concession and the case reversed. Instead, as it was presented, we felt the case should only be substantially modified and affirmed. On this rehearing the defendant again briefed the case although the state ignored the matter. We did not let the defendant's brief suffice, but have examined the law extensively on the subject that justice according to law might be rendered. Hence, our conclusions hereinafter set forth.

The two sections of the statute involved herein are 21 O.S.A. sections 643 and 645, reading respectively as follows:

"To use or to attempt to offer to use force or violence upon or toward the person of another is not unlawful in the following cases. * * * When committed either by the party about to be injured, or by any other person in his aid or defense, in preventing or attempting to prevent an offense against his person, or any trespass or other unlawful interference with real or personal property in his lawful possession; provided the force or violence used is not more than sufficient to prevent such offense. * * *

"Every person who, with intent to do bodily harm and without justifiable or excusable cause, commits any assault and battery upon the person of another with any sharp or dangerous weapon, or who, without such cause, shoots or attempts to shoot at another, with any kind of firearm or air gun or other means whatever, with intent to injure any person, although without intent to kill such person or to commit any felony, is punishable by imprisonment in a county jail not exceeding one (1) year. R.L. 1910, § 2344; Laws 1957, p. 161, § 1."

It is apparent that these sections are concerned with the "use of force or violence by one person against another", hence, they must be construed together.

The gist of section 643 is self-defense in attempting to prevent an offense against the person, but the use of such force or violence, under such premise, is limited to not more than sufficient to prevent such offense. Under the provisions of section 645, this right is further limited by the terms "justifiable" or "excusable". Under these conditions it clearly appears that the use of force or violence is lawful in defense of one's person, provided the use of it is reasonably designed to prevent one from barbarously and needlessly injuring one's adversary. This means a citizen is not required to sit on his hands when he is about to become the victim of an assault and battery, but he may resort to appropriate means to resist the force about to be applied. Nevertheless, section 645 brands the citizen with the mark of a felon when he resorts to the use of force without justifiable excuse or cause. These provisions of the statute were not briefed in the first instance by the defendant, and we repeat, not briefed at all by the state.

Applying this construction to the case at bar, the victim of the shooting herein was twice interrupted in his roadside visitation with his girl friend by the dropping of firecrackers in the vicinity of his automobile, which put him in fear of bodily harm. The defendant and his associate then withdrew and drove away. The matter should have rested there, but no, the victim stepped on the gas, "gunned his car", overtook the defendant's car, drove

him to the side of the road, putting his car in position to block the defendant's passage, then jumped out of his car, and according to all the unbiased witnesses, assaulted the defendant with vile language and started to pull the defendant out of his car. After a scuffle a shot was heard and the victim was wounded. The defendant testified that he told the victim to "stand back, stand back, I have a gun".

These facts bring the case clearly within Moore v. State, written by the late Judge Matson, 25 Okl.Cr. 118, 218 P. 1102, 1105, not discovered by the court or heretofore called to our attention by the defendant, wherein this court said:

"* * * It must be understood in this connection that it is intended not to be held, and that we do not hold, that the right of self-defense can never arise at any stage of a difficulty when one is defending himself against dangers of any kind which he may have unlawfully provoked. In all cases where one has withdrawn from the affray or difficulty at far as he possibly can and fairly indicates his desire for peace, and is thereafter pursued by the other party who renews the difficulty, his right of self-defense, though once lost, is revived and may be successfully pleaded by him, and thereafter his actions will be justified even to the extent of taking human life if necessary * * *."

The rule is correctly stated in both 6 C.J.S. Assault and Battery § 92 subsec. (4), p. 947, notes 97–98, as well as in 40 C.J.S. Homicide § 121, p. 995, notes 92–95, and cases cited thereunder. It is concisely stated in Parker v. United States, 81 U.S.App. D.C. 282, 158 F.2d 185, approving such an instruction to the jury. The rule in homicide cases is so applicable to the case at bar we quote from it as follows:

"Where one who has provoked a combat abandons or withdraws from it in good faith, and not merely for the purpose of gaining advantage, and by his conduct clearly shows his desire to decline any further struggle, his right of self-defense is restored, and if thereafter he is pursued by his adversary, he is justified or excused in killing him if necessary to save himself from death or great bodily harm, although the whole transaction consists of but one combat or assault. In order that the right of self-defense may be restored to a person who has provoked or commenced a combat, he must attempt in good faith to withdraw from the combat. He must also in some manner make known his intention to his adversary * * *"

In the case at bar, the defendant had withdrawn from the scene in full retreat, which this victim could clearly observe. As was said in People v. Button, 106 Cal. 628, 39 P. 1073, 1075, 28 L.R.A. 591:

"If the subsequent acts of the attacking party be such as to indicate to a reasonable man that he in good faith has withdrawn from the combat, they must be held to so indicate to the party attacked. Again, the party attacked must also act in good faith. He must act in good faith towards the law, and allow the law to punish the offender. He must not continue the combat for the purpose of wreaking vengeance, for then he is no better than his adversary. The law will not allow him to say, 'I was not aware * * * of such withdrawal. If the party assailed has eyes to see, he must see; and, if he has ears to hear, he must hear. He has no right to close his eyes or deaden his ears * * *.'"

It is clearly apparent that the victim of the original assault pursued this defendant for the purpose of wreaking vengeance, and in so doing he was in no better, but possibly worse, position than Townley, in light of all the facts. See in this connection State v. Moncado, Mo., 34 S.W.2d 59, 61, clearly in point herein; wherein the court held:

"* * * According to the state's evidence, defendant began the difficulty, and its evidence is subject to the

inference that defendant did not injure or mortally wound deceased until after he had abandoned the conflict, and until he considered it necessary to use force to protect life and limb. We think an instruction involving that principle should have gone to the jury, and, consequently, the action of the court constituted prejudicial error."

See also State v. Mayberry, 360 Mo. 35, 226 S.W.2d 725, so holding.

Under the foregoing facts and the rule of Moore v. State, supra, and other cases, the defendant was entitled to have an instruction clearly defining the law as to whom, at the time of the shooting, was the aggressor. In fact, this went to the very heart of the matter, for if the jury, under proper instructions, found that the defendant had withdrawn from the scene of the original assault or disturbance of the peace and was thereafter pursued in a spirit of vengeance by the victim, who renewed the difficulty, the defendant's right of self-defense was available to him, and the jury should have been so instructed.

■■ The trial court gave instruction No. 7 defining aggressor as follows:

"You are instructed that the term 'aggressor', as that term is used in these instructions, means one who, by his or her wrongful conduct, provokes or brings about an altercation."

We find no fault with this definition as an abstraction, except when applied together with instruction No. 12 reading in part as follows:

"You are instructed that the right of self-protection is given to every citizen but this right cannot be pleaded as a defense and relied upon for an acquittal by one who, himself, is the aggressor or by one who enters voluntarily into a difficulty armed with a deadly weapon no matter how great his danger or how imminent his peril may become during the course of the difficulty. * * *"

In this instruction the court assumed that the defendant was the aggressor and gave no consideration to the fact that he was leaving the scene after the firecracker incident, and was pursued by the victim who, himself, had forsaken his lawful role and become, himself, the aggressor. In light of the rule laid down in Moore v. State, supra, and other authorities, the court's instruction No. 12 precluded the jury from giving proper consideration to the all-important issue of the defendant's right of self-defense and placed him in the role of a provoker under instruction No. 7, notwithstanding his peaceful retreat from the scene of the original provocation or firecracker assault. It was defendant's fundamental right to have the jury properly instructed on this material issue, which omission may have prejudiced the defendant in a fair consideration of his lawful rights and it was reversible error for the trial court not to have so instructed the jury. Adams v. State, 93 Okl.Cr. 333, 228 P.2d 195. In Anderson v. State, 90 Okl.Cr. 1, 209 P.2d 721, 722, this court said:

"Where there is a correct instruction upon a material question in a case, and in another portion of the instructions there is an incorrect statement of the law, upon the same question, it cannot be said that the law has been clearly and fully given to the jury, and reversible error has been committed."

It is defendant's right under such conditions to raise the issue for the first time on appeal in such case. Hall v. State, Okl.Cr., 316 P.2d 620, hence, our consideration, notwithstanding his failure to object at the trial to instruction No. 12.

■■ We are of the opinion the applicable law herein is that despite the fact the defendant was armed with a pistol unlawfully, it does not deprive him of the right to use it in his necessary self-defense, if without that fact the right would have existed. In other words, if without the pistol his right of self-defense existed, the fact that he had it, even though unlawfully, would not defeat his right to use it if the facts warranted its use for his necessary protection. If, however, he was arm-

ed with the pistol for the purpose of aggression as incident to this provocation, which brought on the difficulty, then such fact would deprive him of his claim of self-defense. If, however, as the facts seemed to have developed, he may have been in possession of the pistol for another purpose and for the purpose of self-defense in anticipation of possible attack from another source, and not an instrument of aggression incident to the provocation herein, he may assert his right of self-defense. In this connection, there is some evidence for the defense that the pistol was not possessed as an incident of aggression incident to the provocation herein, but otherwise for self-protection. The foregoing rules must be considered in light of all the facts, such as the reasons for possession of the pistol and the fact that the defendant, under this record, had abandoned the aggravation and was in retreat, which the circumstance may have evinced a clear intent to abandon the incident. 40 C.J.S. Homicide § 119, p. 992 (Carrying Firearms). These are all matters for the consideration of the jury, under proper instructions, State v. Malone, Mo., 301 S.W.2d 750, which should have been given by the trial court.

The defendant next seeks what he calls diminution of the record on appeal by inclusion in this record certain matters that occurred in the trial of another separate and distinct case in order to demonstrate what he contends is an arbitrary rule of court, the effect of which is to deny due process. The procedure the defendant seeks to invoke is both daring and novel. The matter sought to be included in this case was in relation to a statement appearing in the other unrelated case concerning the rules of the court as applied in cases where suspension of the sentence was sought. The alleged statement which the defendant seeks to inject into this case is taken from Gillespie v. State, Okl.Cr., 355 P.2d 451. It was tried by a judge not the same who tried the within case. The statement in part reads as follows:

"The court * * *:

" 'When you go to trial in this court before a jury and you are convicted, you don't get a suspended sentence unless the jury insists on it in their verdict, and I think you are all familiar with that. The next question is, how much should he receive. You just don't get a suspended sentence, *you are not gambling with me.*'

"The court * * *:

" 'Well, I am not going to suspend a sentence for anyone who goes to trial before a jury in this court and is convicted, unless the jury insists upon it in their verdict. Now, everybody knows that, as do all of the other judges. All right, that's the end of that.' "

Thus the defendant seeks to support the record he failed to make in this case by the record in another case on the theory that we will take judicial cognizance of our own records: Ex parte Collins, 76 Okl.Cr. 163, 135 P.2d 61; Coburn v. State, 78 Okl.Cr. 362, 148 P.2d 483; Jones v. State, Okl.Cr., 341 P.2d 616. We may take judicial notice of our own records in a proper case, but to do so herein would constitute an ingenious attempt on our part at legalistic transfusion from a live record into a dead one that languished and died for lack of proper preservation or preparation. The defendant admits that he did not preserve the question in the trial of his case. The office of a suggestion of diminution of the record is to perfect the record in the appellate court so that it may correspond in all particulars with the original on file in the office of the clerk of the trial court. Fuller v. Fuller, 197 Ga. 719, 30 S.E.2d 600. The matter we are asked to engraft on the record before us might have been pertinent through some legalistic contortion had it been made a part of the record in trial court in support of the question now presented to us. It might have supported the contention that the trial court arbitrarily refused to consider the defendant for sus-

pended sentence under the provisions of 22 O.S.A. § 991 since it appears that under the law the defendant may have been eligible for consideration for such a suspended sentence. The defendant contends that the trial court arbitrarily and capriciously refused to consider his application for a suspended sentence solely because he had elected to stand trial instead of pleading guilty to the offense and refused to hear the matter as a circumstance for the exercise of judicial discretion. In effect the defendant contends that the situation was controlled by rule of court and not dictated by reason and conscience of the judge to attain a just result based upon the law and the conditions of the case. He relies upon the proposition of a lack of valid exercise of judicial discretion. 48 C.J.S. Judges § 44 p. 1008, notes 73–74:

> "Broadly stated, the judicial discretion of a judge * * * and its valid exercise connotes direction by the reason and conscience of the judge to a just result, taking account of the law and the particular circumstances of the case, Branden v. Board of Com'rs of Town of Montclair, 124 N.J.L. 135, 11 A.2d 304 and precludes capricious or arbitrary action."

In re Welisch, 18 Ariz. 517, 163 P. 264, 265. In re Martin, 170 Misc. 919, 11 N.Y.S. 2d 607, 608, 609, it is concisely defined:

> "Judicial discretion is not mere arbitrary rule conferring on judge right to make judicial determination blindly, nor palliation for capricious discrimination, but is regulated in a measure by precedence."

Also Vickers v. Phillip Carey Co., 49 Okl. 231, 151 P. 1023, L.R.A.1916C, 1155 and Sykes v. Blakey, 215 N.C. 61, 200 S.E. 910, 911 stating:

> " 'Judicial discretion, said Coke, is never exercised to give effect to the mere will of the judge, but to the will of the law. The judge's proper function, when using it, is to discern according to law what is just in the premises.' "

The defendant intimates in the case at bar that the trial court may have permitted the will of the judges, as expressed in the rule of the court, to supercede the statutes and the court's discretion, which Lord Mansfield said, "means sound discretion guided by law." The record in this case, however, is sought to be established by diminution by "robbing of Peter to pay Paul" process. It is vague and uncertain as to what actually transpired at the time of trial. It does, however, create a strong suspicion "de-hors" this record that the rules of the District Court of Oklahoma County may provide that where a person stands trial before a jury he forfeits his right to make application for suspended sentence. Upon that premise the defendant asserts that he was denied due process of law in that the law is being applied in an unconstitutional manner. He cites in support thereof Griffin v. People of State of Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891; Hernandez v. State of Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866; Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161, 3 A.L.R.2d 441. Defendant says that the prohibition of the equal protection clause of the 14th amendment extends to all cases of invidious discrimination. Morey v. Doud, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485; Dowd v. United States, 340 U.S. 206, 71 S.Ct. 262, 95 L.Ed. 215, 19 A.L.R.2d 784; Cochran v. State of Kansas, 316 U.S. 255, 62 S.Ct. 1068, 86 L.Ed. 1453. He contends that where due process or constitutional rights are involved the court may go behind and beyond the record to test jurisdiction. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461. While this is a challenging thought, on the record thus presented we do not believe that the matter is properly before us; notwithstanding it has a meritorious ring when viewed without the aid of a brief from the state. But we can see no end to the possibility of interminable confusion if the record of one case can be supplemented or added to another case record under the guise of diminution. However, in view of the necessity of reversal on

other grounds it is not necessary that we decide this matter.

On the ground of failure of the trial court to properly instruct the jury the cause is reversed and remanded for a new trial.

POWELL, P. J., concurs.

NIX, J., not participating.